UNITED BROTHERHOOD OF CARPENTERS &
JOINERS OF AMERICA, LOCAL 610,
AFL–CIO, ET AL. *v.* SCOTT ET AL.

No. 82–486.   Argued April 26, 1983—Decided July 5, 1983

*Laurence Gold* argued the cause for petitioners. With him on the briefs were *Martin W. Dies* and *George Kaufmann.*

*Robert Q. Keith* argued the cause for respondents. With him on the brief were *Lino A. Graglia* and *John H. Smither.**

*Briefs of *amici curiae* urging affirmance were filed by *Burt Neuborne* for the American Civil Liberties Union; by *Tom Martin Davis, Jr.,* for Associated Builders & Contractors, Inc.; by *Robert T. Thompson, Melvin R. Hutson,* and *Stephen A. Bokat* for the Chamber of Commerce of the United States; by *David Crump* for the Legal Foundation of America; and by *Rex H. Reed* for the National Right to Work Legal Defense Foundation.

JUSTICE WHITE, delivered the opinion of the Court.

This case concerns the scope of the cause of action made available by 42 U. S. C. § 1985(3) (1976 ed., Supp. V)* to those injured by conspiracies formed "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws."

I

A. A. Cross Construction Co., Inc. (Cross), contracted with the Department of the Army to construct the Alligator Bayou Pumping Station and Gravity Drainage Structure on the Taylor Bayou Hurricane Levee near Port Arthur, Tex. In accordance with its usual practice, Cross hired workers for the project without regard to union membership. Some of them were from outside the Port Arthur area. Employees

---

*Title 42 U. S. C. § 1985(3) (1976 ed., Supp. V), in its entirety, provides as follows:

"(3) Depriving persons of rights or privileges

"If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

of Cross were several times warned by local residents that Cross' practice of hiring nonunion workers was a matter of serious concern to many in the area and that it could lead to trouble. According to the District Court, the evidence showed that at a January 15, 1975, meeting of the Executive Committee of the Sabine Area Building and Construction Trades Council a citizen protest against Cross' hiring practices was discussed and a time and place for the protest were chosen. On the morning of January 17, a large group assembled at the entrance to the Alligator Bayou construction site. In the group were union members present at the January 15 meeting. From this gathering several truckloads of men emerged, drove on to the construction site, assaulted and beat Cross employees, and burned and destroyed construction equipment. The District Court found that continued violence was threatened "if the nonunion workers did not leave the area or concede to union policies and principles." *Scott* v. *Moore,* 461 F. Supp. 224, 227 (ED Tex. 1978). The violence and vandalism delayed construction and led Cross to default on its contract with the Army.

The plaintiffs in this case, after amendment of the complaint, were respondents Scott and Matthews—two Cross employees who had been beaten—and the company itself. The Sabine Area Building and Trades Council, 25 local unions, and various individuals were named as defendants. Plaintiffs asserted that defendants had conspired to deprive plaintiffs of their legally protected rights, contrary to 42 U. S. C. § 1985(3) (1976 ed., Supp. V). The case was tried to the court. A permanent injunction was entered, and damages were awarded against 11 of the local unions, $5,000 each to the individual plaintiffs and $112,385.44 to Cross, plus attorney's fees in the amount of $25,000.

In arriving at its judgment, the District Court recognized that to make out a violation of § 1985(3), as construed in *Griffin* v. *Breckenridge,* 403 U. S. 88, 102–103 (1971), the plaintiff must allege and prove four elements: (1) a conspiracy;

(2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. The District Court found that the first, third, and fourth of these elements were plainly established. The issue, the District Court thought, concerned the second element, for in construing that requirement in *Griffin*, we held that the conspiracy not only must have as its purpose the deprivation of "equal protection of the laws, or of equal privileges and immunities under the laws," but also must be motivated by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Id.*, at 102. *Griffin* having involved racial animus and interference with rights that Congress could unquestionably protect against private conspiracies, the issue the District Court identified was whether private conspiratorial discrimination against employees of a nonunionized entity is the kind of conduct that triggers the proscription of § 1985(3). The District Court concluded that the conspiracy encompassed violations of both the civil and criminal laws of the State of Texas, thus depriving plaintiff of the protections afforded by those laws, that § 1985(3) proscribes class-based animus other than racial bias, and that the class of nonunion laborers and employers is a protected class under the section. The District Court believed that "men and women have the right to associate or not to associate with any group or class of individuals, and concomitantly, to be free of violent acts against their bodies and property because of such association or non-association." 461 F. Supp., at 230. The conduct evidenced a discriminatory animus against nonunion workers; hence, there had been a violation of the federal law.

The Court of Appeals, sitting en banc, except for setting aside for failure of proof the judgment against 8 of the 11 local

unions, affirmed the judgment of the District Court. *Scott v. Moore*, 680 F. 2d 979 (CA5 1982). The Court of Appeals understood respondents' submission to be that petitioners' conspiracy was aimed at depriving respondents of their First Amendment right to associate with their fellow nonunion employees and that this curtailment was a deprivation of the equal protection of the laws within the meaning of § 1985(3). The Court of Appeals agreed, for the most part, holding that the purpose of the conspiracy was to deprive plaintiffs of their First Amendment right not to associate with a union. The court rejected the argument that it was necessary to show some state involvement to demonstrate an infringement of First Amendment rights. This argument, it thought, had been expressly rejected in *Griffin*, and it therefore felt compelled to disagree with two decisions of the Court of Appeals for the Seventh Circuit espousing that position. *Murphy* v. *Mount Carmel High School*, 543 F. 2d 1189 (1976); *Dombrowski* v. *Dowling*, 459 F. 2d 190 (1972). The Court of Appeals went on to hold that § 1985(3) reached conspiracies motivated either by political or economic bias. Thus petitioners' conspiracy to harm the nonunion employees of a nonunionized contractor embodied the kind of class-based animus contemplated by § 1985(3) as construed in *Griffin*. Because of the importance of the issue involved, we granted certiorari, 459 U. S. 1034. We now reverse.

## II

We do not disagree with the District Court and the Court of Appeals that there was a conspiracy, an act done in furtherance thereof, and a resultant injury to persons and property. Contrary to the Court of Appeals, however, we conclude that an alleged conspiracy to infringe First Amendment rights is not a violation of § 1985(3) unless it is proved that the State is involved in the conspiracy or that the aim of the conspiracy is to influence the activity of the State. We

also disagree with the Court of Appeals' view that there was present here the kind of animus that § 1985(3) requires.

## A

The Equal Protection Clause of the Fourteenth Amendment prohibits any State from denying any person the equal protection of the laws. The First Amendment, which by virtue of the Due Process Clause of the Fourteenth Amendment now applies to state governments and their officials, prohibits either Congress or a State from making any "law . . . abridging the freedom of speech, . . . or the right of the people peaceably to assemble." Had § 1985(3) in so many words prohibited conspiracies to deprive any person of the equal protection of the laws guaranteed by the Fourteenth Amendment or of freedom of speech guaranteed by the First Amendment, it would be untenable to contend that either of those provisions could be violated by a conspiracy that did not somehow involve or affect a State.

> "It is a commonplace that rights under the Equal Protection Clause itself arise only where there has been involvement of the State or of one acting under the color of its authority. The Equal Protection Clause 'does not . . . add any thing to the rights which one citizen has under the Constitution against another.' *United States* v. *Cruikshank*, 92 U. S. 542, 554–555. As Mr. JUSTICE DOUGLAS more recently put it, 'The Fourteenth Amendment protects the individual against *state action*, not against wrongs done by *individuals*.' *United States* v. *Williams*, 341 U. S. 70, 92 (dissenting opinion). This has been the view of the Court from the beginning. *United States* v. *Cruikshank, supra; United States* v. *Harris*, 106 U. S. 629; *Civil Rights Cases*, 109 U. S. 3; *Hodges* v. *United States*, 203 U. S. 1; *United States* v. *Powell*, 212 U. S. 564. It remains the Court's view today. See, *e. g., Evans* v. *Newton*, 382 U. S. 296;

*United States* v. *Price, post,* p. 787." *United States* v. *Guest,* 383 U. S. 745, 755 (1966).

The opinion for the Court by Justice Fortas in the companion case characterized the Fourteenth Amendment rights in the same way:

> "As we have consistently held 'The Fourteenth Amendment protects the individual against *state action,* not against wrongs done by *individuals.'* *Williams I,* 341 U. S., at 92 (opinion of Douglas, J.)" *United States* v. *Price,* 383 U. S. 787, 799 (1966).

In this respect, the Court of Appeals for the Seventh Circuit was thus correct in holding that a conspiracy to violate First Amendment rights is not made out without proof of state involvement. *Murphy* v. *Mount Carmel High School, supra,* at 1193.

*Griffin* v. *Breckenridge* is not to the contrary. There we held that § 1985(3) reaches purely private conspiracies and, as so interpreted, was not invalid on its face or as there applied. We recognized that the language of the section referring to deprivations of "equal protection" or of "equal privileges and immunities" resembled the language and prohibitions of the Fourteenth Amendment, and that if § 1985(3) was so understood, it would be difficult to conceive of a violation of the statute that did not involve the State in some respect. But we observed that the section does not expressly refer to the Fourteenth Amendment and that there is nothing "inherent" in the language used in § 1985(3) "that requires the action working the deprivation to come from the State." 403 U. S., at 97. This was a correct reading of the language of the Act; the section is not limited by the constraints of the Fourteenth Amendment. The broader scope of § 1985(3) became even more apparent when we explained that the conspiracy at issue was actionable because it was aimed at depriving the plaintiffs of rights protected by the Thirteenth Amendment and the right to travel guaranteed by the Federal Constitu-

tion. Section 1985(3) constitutionally can and does protect those rights from interference by purely private conspiracies.

*Griffin* did not hold that even when the alleged conspiracy is aimed at a right that is by definition a right only against state interference the plaintiff in a § 1985(3) suit nevertheless need not prove that the conspiracy contemplated state involvement of some sort. The complaint in *Griffin* alleged, among other things, a deprivation of First Amendment rights, but we did not sustain the action on the basis of that allegation and paid it scant attention. Instead, we upheld the application of § 1985(3) to private conspiracies aimed at interfering with rights constitutionally protected against private, as well as official, encroachment.

Neither is respondents' position helped by the assertion that even if the Fourteenth Amendment does not provide authority to proscribe exclusively private conspiracies, precisely the same conduct could be proscribed by the Commerce Clause. That is no doubt the case; but § 1985(3) is not such a provision, since it "provides no substantive rights itself" to the class conspired against. *Great American Federal Savings & Loan Assn.* v. *Novotny*, 442 U. S. 366, 372 (1979). The rights, privileges, and immunities that § 1985(3) vindicates must be found elsewhere, and here the right claimed to have been infringed has its source in the First Amendment. Because that Amendment restrains only official conduct, to make out their § 1985(3) case, it was necessary for respondents to prove that the State was somehow involved in or affected by the conspiracy.

The Court of Appeals accordingly erred in holding that § 1985(3) prohibits wholly private conspiracies to abridge the right of association guaranteed by the First Amendment. Because of that holding the Court of Appeals found it unnecessary to determine whether respondents' action could be sustained under § 1985(3) as involving a conspiracy to deprive respondents of rights, privileges, or immunites under state law or those protected against private action by the Fed-

eral Constitution or federal statutory law. Conceivably, we could remand for consideration of these possibilities, or we ourselves could consider them. We take neither course, for in our view the Court of Appeals should also be reversed on the dispositive ground that § 1985(3)'s requirement that there must be "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action," *Griffin* v. *Breckenridge,* 403 U. S., at 102, was not satisfied in this case.

## B

As indicated above, after examining the language, structure, and legislative history of § 1985(3), the *Griffin* opinion emphatically declared that the section was intended to reach private conspiracies that in no way involved the State. The Court was nevertheless aware that the sweep of § 1985 as originally introduced in the House provoked strong opposition in that chamber and precipitated the proposal and adoption of a narrowing amendment, which limited the breadth of the bill so that the bill did not provide a federal remedy for "all tortious, conspiratorial interferences with the rights of others." 403 U. S., at 101. In large part, opposition to the original bill had been motivated by a belief that Congress lacked the authority to punish every assault and battery committed by two or more persons. *Id.,* at 102; Cong. Globe, 42d Cong., 1st Sess., App. 68, 115, 153, 188, 315 (1871); *id.,* at 485–486, 514. As we interpreted the legislative history 12 years ago in *Griffin,* the narrowing amendment "centered entirely on the animus or motivation that would be required . . . ." 403 U. S., at 100. Thus:

> "The constitutional shoals that would lie in the path of interpreting § 1985(3) as a general federal tort law can be avoided by giving full effect to the congressional purpose—by requiring, as an element of the cause of action, the kind of invidiously discriminatory motivation stressed by the sponsors of the limiting amend-

ment.   See the remarks of Representatives Willard and
Shellabarger, quoted *supra*, at 100.   The language
requiring intent to deprive of *equal* protection, or *equal*
privileges and immunities, means that there must be
some racial, or perhaps otherwise class-based, invidiously
discriminatory animus behind the conspirators' action.
The conspiracy, in other words, must aim at a depriva-
tion of the equal enjoyment of rights secured by the law
to all."   *Id.*, at 102 (footnotes omitted).

This conclusion was warranted by the legislative history,
was reaffirmed in *Novotny, supra,* and we accept it as the
authoritative construction of the statute.

Because the facts in *Griffin* revealed an animus against
Negroes and those who supported them, a class-based, in-
vidious discrimination which was the central concern of
Congress in enacting § 1985(3), the Court expressly declined
to decide "whether a conspiracy motivated by invidiously dis-
criminatory intent other than racial bias would be actionable
under the portion of § 1985(3) before us."   403 U. S., at 102,
n. 9.   Both courts below answered that question; both held
that the section not only reaches conspiracies other than
those motivated by racial bias but also forbids conspiracies
against workers who refuse to join a union.   We disagree
with the latter conclusion and do not affirm the former.

C

The Court of Appeals arrived at its result by first describ-
ing the Reconstruction-era Ku Klux Klan as a political orga-
nization that sought to deprive a large segment of the South-
ern population of political power and participation in the
governance of those States and of the Nation.   The Court of
Appeals then reasoned that because Republicans were among
the objects of the Klan's conspiratorial activities, Republi-
cans in particular and political groups in general were to be
protected by § 1985(3).   Finally, because it believed that an
animus against an economic group such as those who pre-

ferred nonunion association is "closely akin" to the animus against political association, the Court of Appeals concluded that the animus against nonunion employees in the Port Arthur area was sufficiently similar to the animus against a political party to satisfy the requirements of § 1985(3).

We are unpersuaded. In the first place, it is a close question whether § 1985(3) was intended to reach any class-based animus other than animus against Negroes and those who championed their cause, most notably. Republicans. The central theme of the bill's proponents was that the Klan and others were forcibly resisting efforts to emancipate Negroes and give them equal access to political power. The predominant purpose of § 1985(3) was to combat the prevalent animus against Negroes and their supporters. The latter included Republicans generally, as well as others, such as Northerners who came South with sympathetic views towards the Negro. Although we have examined with some care the legislative history that has been marshaled in support of the position that Congress meant to forbid wholly nonracial, but politically motivated conspiracies, we find difficult the question whether § 1985(3) provided a remedy for every concerted effort by one political group to nullify the influence of or do other injury to a competing group by use of otherwise unlawful means. To accede to that view would go far toward making the federal courts, by virtue of § 1985(3), the monitors of campaign tactics in both state and federal elections, a role that the courts should not be quick to assume. If respondents' submission were accepted, the proscription of § 1985(3) would arguably reach the claim that a political party has interfered with the freedom of speech of another political party by encouraging the heckling of its rival's speakers and the disruption of the rival's meetings.

We realize that there is some legislative history to support the view that § 1985(3) has a broader reach. Senator Edmunds' statement on the floor of the Senate is the clearest expression of this view. He said that if a conspiracy

were formed against a man "because he was a Democrat, if you please, or because he was a Catholic, or because he was a Methodist, or because he was a Vermonter, . . . then this section could reach it." Cong. Globe, 42d Cong., 1st Sess., 567 (1871). The provision that is now § 1985(3), however, originated in the House. The narrowing amendment, which changed § 1985(3) to its present form, was proposed, debated, and adopted there, and the Senate made only technical changes to the bill. Senator Edmunds' views, since he managed the bill on the floor of the Senate, are not without weight. But we were aware of his views in *Griffin*, 403 U. S., at 102, n. 9, and still withheld judgment on the question whether § 1985(3), as enacted, went any farther than its central concern—combating the violent and other efforts of the Klan and its allies to resist and to frustrate the intended effects of the Thirteenth, Fourteenth, and Fifteenth Amendments. Lacking other evidence of congressional intention, we follow the same course here.

## D

Even if the section must be construed to reach conspiracies aimed at any class or organization on account of its political views or activities, or at any of the classes posited by Senator Edmunds, we find no convincing support in the legislative history for the proposition that the provision was intended to reach conspiracies motivated by bias towards others on account of their *economic* views, status, or activities. Such a construction would extend § 1985(3) into the economic life of the country in a way that we doubt that the 1871 Congress would have intended when it passed the provision in 1871.

Respondents submit that Congress intended to protect two general classes of Republicans, Negroes and Northern immigrants, the latter because the Klan resented carpetbagger efforts to dominate the economic life of the South. Respondents rely on a series of statements made during the debates on the Civil Rights Act of 1871, of which § 1985 was a part,

indicating that Northern laborers and businessmen who had come from the North had been the targets of Klan conspiracies. Brief for Respondents 42–44. As we understand these remarks, however, the speakers believed that these Northerners were viewed as suspect because they were Republicans and were thought to be sympathetic to Negroes. We do not interpret these parts of the debates as asserting that the Klan had a general animus against either labor or capital, or against persons from other States as such. Nor is it plausible that the Southern Democrats were prejudiced generally against enterprising persons trying to better themselves, even if those enterprising persons were from Northern States. The animus was against Negroes and their sympathizers, and perhaps against Republicans as a class, but not against economic groups as such. Senator Pool, on whose remarks respondents rely, identified what he thought was the heart of the matter:

> "The truth is that whenever a northern man, who goes into a southern State, will prove a traitor to the principles which he entertained at home, when he will lend himself to the purposes of the Democracy or be purchased by them, they forget that he is a carpet-bagger and are ready to use him and elevate him to any office within their gift." Cong Globe, 42nd Cong., 1st. Sess., 607 (1871).

We thus cannot construe § 1985(3) to reach conspiracies motivated by economic or commercial animus. Were it otherwise, for example, § 1985(3) could be brought to bear on any act of violence resulting from union efforts to organize an employer or from the employer's efforts to resist it, so long as the victim merely asserted and proved that the conduct involved a conspiracy motivated by an animus in favor of unionization, or against it, as the case may be. The National Labor Relations Act, 29 U. S. C. § 151 *et seq.* (1976 ed. and Supp. V), addresses in great detail the relationship between employer, employee, and union in a great variety of situa-

tions, and it would be an unsettling event to rule that strike and picket-line violence must now be considered in the light of the strictures of § 1985(3). Moreover, if antiunion, antinonunion, or antiemployer biases represent the kinds of animus that trigger § 1985(3), there would be little basis for concluding that the statute did not provide a cause of action in a variety of other situations where one economic group is pitted against another, each having the intent of injuring or destroying the economic health of the other. We think that such a construction of the statute, which is at best only arguable and surely not compelled by either its language or legislative history, should be eschewed and that group actions generally resting on economic motivations should be deemed beyond the reach of § 1985(3). Economic and commercial conflicts, we think, are best dealt with by statutes, federal or state, specifically addressed to such problems, as well as by the general law proscribing injuries to persons and property. If we have misconstrued the intent of the 1871 Congress, or, in any event, if Congress now prefers to take a different tack, the Court will, of course, enforce any statute within the power of Congress to enact.

Accordingly, the judgment of the Court of Appeals is

*Reversed.*

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE O'CONNOR join, dissenting.

The Ku Klux Klan Act was the Reconstruction Congress' response to politically motivated mob violence in the postbellum South designed to intimidate persons in the exercise of their legal rights. While § 1 of the Act prohibits state officials from violating the federal rights of citizens, § 2 addresses the problem of mob violence directly.[1] It provides

_____

[1] Section 1 of the Act is now codified as 42 U. S. C. § 1983 (1976 ed., Supp. V). Section 2, in addition to the prohibition at issue here (now codified in § 1985(3), first clause), prohibits conspiracies to interfere with the performance of duties by federal officers (§ 1985(1)), with the administra-

criminal and civil liability for private conspiracies to deprive "either directly or indirectly, any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws." Act of Apr. 20, 1871, § 2, 17 Stat. 13 (current version at 42 U. S. C. § 1985(3) (1976 ed., Supp. V)). Today, in a classic case of mob violence intended to intimidate persons from exercising their legal rights, the Court holds that the Ku Klux Klan Act provides no protection.

## I

The Court first holds that § 1985(3) prohibits a private conspiracy to interfere with the exercise of First Amendment rights only if some state action is involved.[2] *Ante,* at 830–834. The Court assumes that § 1985(3) merely bans private conspiracies to accomplish deprivations that are actionable under § 1983 when caused by state officials. Although Congress could have passed such a statute, the simple fact is that it did not.

## A

On its face, § 1985(3) differs structurally from § 1983. *Briscoe* v. *LaHue,* 460 U. S. 325, 336–337 (1983); *id.,* at 356 (MARSHALL, J., dissenting); *Griffin* v. *Breckenridge,* 403 U. S. 88, 99 (1971). Unlike § 1983, § 1985(3) does not provide a cause of action for the deprivation of independent rights "secured by the Constitution and laws." Instead, it prohibits private conspiracies intended to prevent persons or classes of persons from the equal exercise of any of their

---

tion of federal courts (§ 1985(2), first part), with the administration of state courts, (§ 1985(2), second part), with the duties of a state officer (§ 1985(3), second clause), and with the right to support candidates in a federal election (§ 1985(3), third clause). See *Kush* v. *Rutledge,* 460 U. S. 719, 724 (1983). See generally *Briscoe* v. *LaHue,* 460 U. S. 325, 336, n. 17 (1983) (describing §§ 3–6).

[2] The Court does not require that the conspirators be state officials or act under color of state law. Instead, the requirement is that the conspiracy intend to cause the State or a person acting under color of state law to deprive the victims of the conspiracy of their constitutional rights.

civil rights. No violation of an independent legal right is required; nor does § 1985(3) require state action or the involvement of the State in any other way.

The legislative history unambiguously establishes the meaning and function of the "equal protection" and "equal privileges and immunities" language in § 1985(3).[3] As originally introduced by Representative Shellabarger, § 2 did not contain these terms. Instead, it imposed federal criminal liability on private conspiracies to commit certain enumerated actions that would be federal crimes if committed in an enclave subject to United States jurisdiction.[4] In support of his bill, the Congressman argued that Congress had constitutional authority to legislate against private action in order to protect and secure the rights of national citizenship. Refer-

---

[3] The Court's misinterpretation of the language of the statute is compounded by the Court's subtle confusion of statutory construction with constitutional interpretation. As *Griffin* v. *Breckenridge*, 403 U. S. 88, 104 (1971), established and the Court seemingly recognizes, see *ante*, at 832–833, the two questions are separate. Determining the scope of § 1985(3) is a matter of statutory construction and has nothing to do with current interpretations of the First or Fourteenth Amendments. The 42d Congress' view of its constitutional authority in 1871 to reach private conduct under the Fourteenth Amendment is relevant in interpreting the reach of § 1985(3).

[4] The original version of § 2 provided:

"That if two or more persons shall, within the limits of any State, band or conspire together to do any act in violation of the rights, privileges, or immunities of another person, which, being committed within a place under the sole and exclusive jurisdiction of the United States, would, under any law of the United States then in force, constitute the crime of either murder, manslaughter, mayhem, robbery, assault and battery, perjury, subornation of perjury, criminal obstruction of legal process or resistance of officers in discharge of official duty, arson, or larceny; and if one or more of the parties to said conspiracy shall do any act to effect the object thereof, all the parties to or engaged in said conspiracy, whether principals or accessories *[sic]*, shall be deemed guilty of a felony, and, upon conviction thereof, shall be liable, &c., and the crime shall be punishable as such in the courts of the United States." Cong. Globe, 42d Cong., 1st Sess., App. 68–69 (Mar. 28, 1871) (statement of Rep. Shellabarger), quoting H. R. 320, § 2, 42d Cong., 1st Sess. (1871).

ring to Justice Washington's statement of national privileges and immunities in *Corfield* v. *Coryell,* 6 F. Cas. 546 (No. 3,230) (CCED Pa. 1825), Shellabarger stated that §2 "punishes, not individual crime, but only banded, mastering, confederated violence. Then also it must be directed against the rights, privileges, or immunities of a citizen." Cong. Globe, 42d Cong., 1st Sess., App. 69 (Mar. 28, 1871).

In the debate that followed, radical Republicans supported the bill on a broader ground. They asserted that the Fourteenth Amendment had altered the balance between the States and the National Government so that Congress now was permitted to protect life, liberty, and property by legislating directly against criminal activity.[5] From the beginning of the debate, Democratic and other opponents of the bill saw the radical imprimatur on §2 and argued that it exceeded congressional authority by extending federal jurisdiction to cover common crimes.[6] Republicans of more moderate persuasion also refused to support §2 as proposed, fearing that it reflected the radical view.

Unlike the Democrats, however, the moderate Republicans agreed with Shellabarger that Congress had authority to reach private conduct by virtue of its power to protect the rights of national citizenship. They believed that Fourteenth Amendment rights were possessed by persons regardless of the presence of state action. See Cong. Globe, 42d Cong., 1st Sess., App. 153 (Apr. 4, 1871) (remarks of Rep. Garfield); *id.,* at 486 (Apr. 5, 1871) (remarks of Rep. Cook); *Monell* v. *New York City Dept. of Social Services,* 436 U. S. 658, 673 (1978). The dispute within the Republican majority centered on whether the bill itself was limited to

---

[5] See, *e. g.,* Cong. Globe, 42d Cong., 1st Sess., App. 73 (Mar. 30, 1871) (remarks of Rep. A. Blair); *id.,* at App. 85 (Mar. 31, 1871) (remarks of Rep. Bingham); *id.,* at App. 141 (Apr. 3, 1871) (remarks of Rep. Shanks).

[6] See, *e. g., id.,* at 337 (Mar. 29, 1871) (remarks of Rep. Whitthorne); *id.,* at 361 (Mar. 31, 1871) (remarks of Rep. Swan); *id.,* at 366 (Mar. 31, 1871) (remarks of Rep. Arthur); *id.,* at 373 (Mar. 31, 1871) (remarks of Rep. Archer).

this purpose, or instead whether it did or should usurp state authority over local and individual crimes.

Although individual views among the moderates differed,[7] the extensive remarks of Representative Garfield summarized their position well. See R. Harris, The Quest for Equality 47 (1960). Garfield did not believe that Congress had the power to displace the criminal jurisdiction of the States. In his view, however, the Fourteenth Amendment provided citizens with an affirmative and congressionally enforceable right to equal protection of the laws: "the provision that the States shall not 'deny the equal protection of the laws' implies that they shall afford equal protection." Cong. Globe, 42d Cong., 1st Sess., App. 153 (Apr. 4, 1871). When the States neglect or refuse to provide equal protection, "it is undoubtedly within the power of Congress to provide by law for the punishment of all persons, official or private, who shall invade these rights [guaranteed by the Civil War Amendments], and who by violence, threats, or intimidation shall deprive any citizen of their fullest enjoyment." *Ibid.*

Garfield's theory of the Fourteenth Amendment was that the right of equal protection of the laws as well as other rights were rights of national citizenship guaranteed directly to the people. They existed independently of any state action. He disagreed with the radicals about the circumstances under which Congress could step in to protect those rights. He stated:

> "[T]he chief complaint is not that the laws of the State are unequal, but that even where the laws are just and

---

[7] Representative Farnsworth, for example, took the more conservative view that Congress could not punish individuals under the Equal Protection Clause, but could only prohibit unequal state legislation. *Id.*, at 115 (Mar. 31, 1871). He ultimately voted for the Act. *Id.*, at 522 (Apr. 6, 1871). Other Republicans held the belief that Congress could punish individuals only when their conspiracy intended to obstruct a state official's duty to provide equal protection of the laws. See Comment, A Construction of Section 1985(c) in Light of Its Original Purpose, 46 U. Chi. L. Rev. 402, 414–415 (1979). The bill as passed, however, was not limited by either type of restriction.

equal on their face, yet, by a systematic maladminis-
tration of them, or a neglect or refusal to enforce their
provisions, a portion of the people are denied equal pro-
tection under them. Whenever such a state of facts
is clearly made out, I believe the last clause of the first
section [of the Fourteenth Amendment] empowers Con-
gress to step in and provide for doing justice to those
persons who are thus denied equal protection." *Ibid.*

Garfield concluded by stating that he could support the bill if
§ 2 was amended to reflect this view. *Ibid.*

Because the moderates held the balance of power, see
Comment, A Construction of Section 1985(c) in Light of Its
Original Purpose, 46 U. Chi. L. Rev. 402, 412, n. 47 (1979),
some amendment was necessary. The day after Garfield's
speech, Shellabarger introduced a new § 2. Cong. Globe,
42d Cong., 1st Sess., 477 (Apr. 5, 1871). The amendment
removed the list of actionable crimes and added a civil cause
of action for persons injured by the conspiracy. It also
added the critical language that imposed liability on persons
who "conspire together for the purpose, either directly or indi-
rectly, of depriving any person or any class of persons of the
equal protection of the laws, or of equal privileges or immuni-
ties under the laws."[8] *Ibid.* According to Shellabarger:

---

[8] Immediately following this clause in the amendment were two other
proposed clauses using similar equal protection language. The first pro-
hibited a conspiracy "for the purpose of preventing or hindering the consti-
tuted authorities of any State from giving or securing to all persons within
such State the equal protection of the laws." Cong. Globe, 42d Cong., 1st
Sess., 477 (Apr. 5, 1871). This clause is now codified at 42 U. S. C.
§ 1985(3), second clause, see n. 1, *supra,* and clearly requires some state
involvement.

The second clause prohibited a conspiracy "to injure any person in his
person or his property for lawfully enforcing the right of any person or
class of persons to the equal protection of the laws." Cong. Globe, 42d
Cong., 1st Sess., 477 (Apr. 5, 1871). An amendment in the Senate added
to this last clause the prohibition of a conspiracy "for the purpose of in any
manner impeding, hindering, obstructing, or defeating the due course of
justice in any State or Territory, with intent to deny to any citizen of the

"The object of the amendment is . . . to confine the authority of this law to the prevention of deprivations which shall attack the equality of rights of American citizens; that any violation of the right, the *animus* and effect of which is to strike down the citizen, to the end that he may not enjoy equality of rights as contrasted with his and other citizens' rights shall be within the scope of the remedies of this section." *Id.*, at 478.

Representative Willard—who opposed the original version and claimed to have drafted the amendment—stated that

"the essence of the crime should consist in the intent to deprive a person of the equal protection of the laws and of equal privileges and immunities under the laws; in other words, that the Constitution secured, and was only intended to secure, equality of rights and immunities, and that we could only punish by United States laws a denial of that equality." *Id.*, at App. 188 (Apr. 6, 1871).

Although these are the only two statements that bear directly on the clause at issue, other Representatives generally approved of the amendment because it avoided the evil of imposing a federal criminal law on the States.[9] As

---

United States the due and equal protection of the laws." *Id.*, at 702 (Apr. 14, 1871). This clause as amended is now codified in the second part of § 1985(2).

[9] For example, Representative Cook, who had opposed the original version and who had introduced similar amendments, see *id.*, at 478 (Apr. 5, 1871) (remarks of Rep. Shellabarger), stated that the amendment did not provide for federal punishment of "an assault and battery when committed by two or more persons within a State." *Id.*, at 485 (Apr. 5, 1871). "The proposition we maintain is that wherever the Constitution of the United States secures a right to a citizen Congress may enforce and protect that right. One absolute test is this: Congress may legislate to protect any right the denial of which by a State court would give the citizen affected thereby a right to appeal to the Supreme Court of the United States for redress. . . . I do not care what that right is, so it is a right which is secured by the Constitution of the United States, either by an affirmative or a negative provision. Whether a right secured by the Constitution touches

amended, this bill was adopted by the House on April 6. *Id.*, at 522.

The Senate considered the House bill for only three days, and with a few limited changes, adopted it on April 14. *Id.*, at 709. In explaining the scope of § 2, Senator Edmunds expressed the view that it included conspiracies to "overthrow the Government, conspiracies to impede the course of justice, conspiracies to deprive people of the equal protection of the laws, whatever those laws may be." *Id.*, at 568 (Apr. 11, 1871). Senator Pool expressed his support by remarking that the Fourteenth Amendment had conferred a new right on every citizen—the right to protection of the laws. *Id.*, at 608 (Apr. 12, 1871).

Throughout the debates on § 2, the Republican majority agreed that the Fourteenth Amendment conferred rights, including the right to equal protection of the laws, directly on persons and that those rights could be violated by private conspirators. The debate was over the conditions under which the Federal Government could step in to assert juris-diction to protect those rights—a separate constitutional

---

the person of a citizen, that right may be protected by the national laws." *Ibid.*

However, Representative Burchard, who shared with Farnsworth a more limited view of congressional authority under the Fourteenth Amendment, see n. 7, *supra,* stated in general terms that "[t]he gravamen of the offense is the unlawful attempt to prevent a State through its offi-cers enforcing in behalf of a citizen of the United States his constitutional right to equality of protection." Cong. Globe, 42d Cong., 1st Sess., App. 315 (Apr. 6, 1871). Shortly thereafter, Representative Farnsworth re-stated his view, see n. 7, *supra,* and attempted to amend the clause imme-diately following the one at issue to limit its scope to federal officers. Cong. Globe, 42d Cong., 1st Sess., 513 (Apr. 6, 1871). After a lengthy colloquy with Representative Poland, *id.,* at 512–514, Farnsworth dropped his amendment. *Id.,* at 515. In any event, Burchard agreed with Cook that the "amendment obviates in a great measure the objections and the doubtful construction as to the extent of jurisdiction for the punishment of crimes intended by the bill. It is not denial of protection, but of equality of protection, which constitutes the offense against the United States." *Id.,* at App. 315 (Apr. 6, 1871).

question of federal-state comity—not over the nature of the rights themselves. By limiting § 2 to deprivations of equal protection and of equal privileges and immunities, the 42d Congress avoided the constitutional problems the more moderate Republicans saw in the creation of a general federal criminal law. The effect of that language was to limit federal jurisdiction to cases in which persons were the victims of private conspiracies motivated by the intent to interfere in the equal exercise and enjoyment of their legal rights.[10] Congress did not intend any requirement of state involvement in either a civil or criminal action under § 2.

## B

Consistent with this view, the Court has held on several occasions that § 2 reaches purely private conspiracies. In *United States* v. *Harris*, 106 U. S. 629 (1883), the Court construed § 2 to prohibit a private conspiracy to deprive certain persons of equal protection by removing them from jail by force and lynching them. Section 2, it stated, applies "no matter how well the State may have performed its duty. Under it private persons are liable to punishment for conspir-

---

[10] The Court in *Great American Federal Savings & Loan Assn.* v. *Novotny*, 442 U. S. 366, 372, 376 (1979), stated that § 1985(3) is a remedial statute and provides no substantive rights. The 42d Congress also believed it was providing a remedy, see Cong. Globe, 42d Cong., 1st Sess., App. 68 (Mar. 28, 1871) (remarks of Rep. Shellabarger)—a remedy for violations of the right to equal protection which it believed was guaranteed against both state and private action. To the extent that the language of § 2 incorporated that interpretation of the scope of the right, it is not strictly remedial from the current perspective on constitutional law. Moreover, like other conspiracy statutes, § 1985(3) "is best viewed as a unique provision for which a remedial versus substantive characterization is misplaced." Note, Private Conspiracies to Violate Civil Rights: The Scope of Section 1985(3) After *Great American Federal Savings & Loan Association* v. *Novotny*, 61 B. U. L. Rev. 1007, 1021 (1981). The *Novotny* Court's statements were accurate, if unnecessary, in the context of the issue in that case, but should not be given independent significance. The Court, however, employs them in summary fashion to dispose of the statutory construction question without real analysis of the issue. *Ante*, at 833.

ing to deprive any one of the equal protection of the laws enacted by the State."[11] *Id.*, at 639; cf. *United States* v. *Williams*, 341 U. S. 70, 76 (1951) (plurality opinion) (similar conspiracy provision, 18 U. S. C. § 241, reaches private action).

*Collins* v. *Hardyman*, 341 U. S. 651 (1951), arose from a political brawl between two white groups. The complaint alleged a § 1985(3) conspiracy to hinder the plaintiffs' equal enjoyment of their First Amendment rights. *Id.*, at 653–654. The Court noted possible constitutional problems with imposing civil liability for this type of activity, *id.*, at 659, but passed over the issue. *Id.*, at 661. Instead, it found that the alleged conspiracy was not one prohibited by the statute because there was no "allegation that defendants were conscious of or trying to influence the law." *Ibid.* The *Collins* decision thus suggested a requirement of state involvement virtually identical to that adopted by the Court today.

*Griffin* v. *Breckenridge*, 403 U. S. 88 (1971), however, put this suggested requirement to rest. In a unanimous decision, the Court stated that the evolution of the law had washed away the constitutional concerns of *Collins*, and that there was no reason "not to accord to the words of the statute their apparent meaning."[12] 403 U. S., at 96. The Court expressly rejected a requirement of state involvement in the

---

[11] Although the indictment was valid under the statute, 106 U. S., at 639, the Court found no constitutional authorization for the criminal prohibition of § 2 under the Fourteenth Amendment, *id.*, at 638–640, citing *United States* v. *Cruikshank*, 92 U. S. 542 (1876), under the Thirteenth and Fifteenth Amendments, 106 U. S., at 637, 640–643, or under Art. 4, § 2, *id.*, at 643.

[12] As the Court notes, *ante*, at 832, the *Griffin* court stated:

"A century of Fourteenth Amendment adjudication has . . . made it understandably difficult to conceive of what might constitute a deprivation of the equal protection of the laws by private persons. Yet there is nothing inherent in the phrase that requires the action working the deprivation to come from the State." 403 U. S., at 97.

This implicitly recognizes that the Members of the 42d Congress believed that the right to equal protection of the laws could be violated by private action.

form of an intent to interfere with state officials.[13]  *Id.*, at 99; see Comment, Private Conspiracies to Violate Civil Rights: *McLellan* v. *Mississippi Power & Light Co.*, 90 Harv. L. Rev. 1721, 1730 (1977) (state involvement requirement is incompatible with *Griffin*).  It then reviewed the legislative history to find that the only statutory limitation on the broad sweep of § 1985(3) was a requirement of "some racial, or perhaps otherwise class-based, invidiously discriminatory animus."  403 U. S., at 102; see *id.*, at 99–102.

As *Griffin* held, the "equal protection of the laws" and the "equal privileges and immunities" language in § 1985(3) was intended by the 42d Congress to prevent the statute from creating a general federal criminal or tort law.  It was not intended to impose a state-action or state-involvement requirement on actions under the statute.  Properly interpreted, § 1985(3) prohibits private conspiracies designed to interfere with persons' equal enjoyment and exercise of their civil rights even if those conspiracies have no state involvement of any kind.[14]

## II

As *Griffin* recognized, the words "equal protection of the laws" and "equal privileges and immunities" limit the types of

---

[13] This form of state action is covered by the second clause of § 1985(3), which imposes liability for hindering a state officer in providing equal protection.  403 U. S., at 99; see nn. 1 and 10, *supra*.  The Court today asserts that *Griffin* rejected a general requirement that the conspiracy itself involve state action, but did not reject specifically the requirement of state involvement when the constitutional right implicated is one against state action.  See n. 2, *supra*.  The Court, however, simply ignores the fact that we also rejected the latter type of requirement as a matter of statutory construction, see 403 U. S., at 99, and arrives at a contradictory construction by imposing the constitutional interpretation of the First and Fourteenth Amendments on the statute.  See n. 3, *supra*.

[14] The Constitution poses no obstacle to this exercise of congressional power.  The Court correctly recognizes that Congress has the power under the Commerce Clause to ban such conspiracies.  *Ante*, at 833; see *Katzenbach* v. *McClung*, 379 U. S. 294, 304 (1964); *Heart of Atlanta Motel, Inc.* v. *United States*, 379 U. S. 241, 257–258 (1964).

actionable private conspiracies to those involving class-based animus. As an initial matter, the intended victims must be victims not because of any personal malice the conspirators have toward them, but because of their membership in or affiliation with a particular class. Cong. Globe, 42d Cong., 1st Sess., 702 (Apr. 14, 1871) (remarks of Sen. Edmunds); see *id.*, at 567 (Apr. 11, 1871) (remarks of Sen. Edmunds). Moreover, the class must exist independently of the defendants' actions; that is, it cannot be defined simply as the group of victims of the tortious action. See *Askew* v. *Bloemker*, 548 F. 2d 673, 678 (CA7 1976); *Lopez* v. *Arrowhead Ranches*, 523 F. 2d 924, 928 (CA9 1975).

## A

Aside from this initial rule of exclusion, however, the types of classes covered by the statute are far from clear. The statutory language is broad and could include a wide variety of class-based denials of equal protection and equal enjoyment of rights; yet it is also indefinite, and in *Griffin,* the Court reserved the question whether nonracial classes are covered. 403 U. S., at 102. The legislative history provides little assistance, probably because the congressional majority had little disagreement on the need to halt conspirational Klan violence and was far more concerned with its constitutional authority to criminalize such conspiracies.

The general statements of the Act's purpose give some indication of the breadth of the remedy Congress provided. Contrary to the Court's suggestion, *ante,* at 835–837, the 42d Congress viewed the Ku Klux Klan as pre-eminently a political organization, whose violence was thought to be premised most often on the political viewpoints of its victims.[15] "They

---

[15] The Klan's goal was to overthrow Republican Reconstruction policies both by terrorizing local supporters of those policies in order to place sympathetic Democrats in office, and when that failed by supplanting the authority of local officials directly with mob violence. See Comment, 46

murder men in their own houses for a difference in political opinions and defy the laws which denounce these acts." Cong. Globe, 42d Cong., 1st Sess., App. 72 (Mar. 30, 1871) (remarks of Rep. Blair); see *id.*, at 391 (Apr. 1, 1871) (remarks of Rep. Elliott). Moreover, as the legislative history surveyed above reveals, Congress recognized that this violence could fester because the general opposition to Reconstruction policies in the South rendered local law enforcement authorities less likely to protect the rights of persons affiliated in any way with those policies.

In my view, Congress intended to provide a federal remedy for all *classes* that seek to exercise their legal rights in unprotected circumstances similar to those of the victims of Klan violence. Instead of contemplating a list of actionable class traits, though, Congress had in mind a functional definition of the scope of § 2. As Representative Garfield stated in the debates, the chief danger was "a systematic maladministration of [the laws], or a neglect or refusal to enforce their provisions." *Id.*, at App. 153 (Apr. 4, 1871). Congress did not require that a § 2 plaintiff allege a neglect on the part of state officers to enforce the laws equally. Instead, it took the view that whenever a conspiracy involved invidious animus toward a class of persons, the possibility of ineffective state enforcement was sufficient to support federal intervention.[16] *Id.*, at 485 (Apr. 5, 1871) (remarks of Rep. Cook).

---

U. Chi. L. Rev., at 408–410. Although Negroes frequently were the objects of this terrorism, they were simply one symbol of the hated Reconstruction policies. According to Senator Pool, "[t]he real question is whether the reconstruction policy of Congress, which was adopted after the close of war and announced as necessary to the future peace and security of this nation, shall be carried into practical effect, or whether it shall practically be nullified by local violence." Cong. Globe, 42d Cong., 1st Sess., App. 101 (Mar. 31, 1871); see *id.*, at 333 (Mar. 29, 1871) (remarks of Rep. Hoar); *id.*, at 390–391 (Apr. 1, 1871) (remarks of Rep. Elliot); *id.*, at App. 252–253 (Apr. 4, 1871) (remarks of Sen. Morton).

[16] That vulnerability is a factor is indicated by Representative Roberts' description of the distribution of mob violence: "Take the political census of

## B

This view of the scope of § 2 is corroborated by congressional statements of concern for another group subject to Klan violence: economic migrants. While the Klan's victims usually were Republicans, Congress extended protection to this group because of its tenuous position in the South. Reconstruction, although mainly a political program, see J. Randall & D. Donald, The Civil War and Reconstruction 592–600 (2d ed. 1961), also was an attempt to reorganize the economic life of the region. W. Du Bois, Black Reconstruction in America 345–353 (1962). Particularly irritating to the poorer Southerners who supported the Ku Klux Klan was the new competition in the labor market from Negroes. *Id.*, at 19; Randall & Donald, *supra*, at 684. Moreover, carpetbaggers from the North moved into the South to seek their fortunes as well as to make new lives. C. Woodward, Reunion and Reaction 52–57 (1966).

Many of the Democratic opponents of the Act saw the Act's protection of Negroes and carpetbaggers as just another facet of the Reconstruction policies of economic exploitation.[17] Republican supporters of the bill also recognized the economic features of Reconstruction. They, however, saw the Klan terrorism as directed at the legitimate economic activities of those who migrated to the South to better them-

---

the States lately in rebellion by districts. Mark those which are strongly Republican and those which are decidedly Democratic. In neither of them will you find systematic assaults upon citizens. The districts which are politically doubtful are scarlet with human gore." *Id.*, at 413 (Apr. 3, 1871); see *id.*, at 607 (Apr. 12, 1871) (remarks of Sen. Pool). Senator Edmunds' frequently quoted remark about Democrats, Vermonters, Catholics, and Methodists, *id.*, at 567 (Apr. 11, 1871), quoted *ante*, at 837, indicates classes that in particular circumstances or in geographic regions might qualify for protection because of their vulnerability.

[17] Representative Swan viewed Reconstruction simply as opening the South to economic exploitation by Northerners under the pretext of aiding Negroes. Cong. Globe, 42d Cong., 1st Sess., 362 (Mar. 31, 1871); see *id.*, at 354 (Mar. 30, 1871) (remarks of Rep. Beck).

selves.[18]   Representative Kelley was the most explicit: he interpreted the Klan problem as essentially one of Southern resistance to economic migrations of Northerners.   *Id.*, at 338–339, 341 (Mar. 29, 1871).[19]

## C

The 42d Congress was concerned about these economic migrants because of their vulnerability as symbols and effects of Reconstruction policies.   Congress' answer to the problem of Klan violence—a problem with political, racial, and economic overtones—was to create a general federal remedy to protect classes of people from private conspiracies aimed at interfering with the class members' equal exercise of their civil rights.   The critical consideration is the 42d Congress' perception that the atrocities perpetrated by the Klan were injuring persons who, largely because of their political affiliation, were unable to demand protection from local law enforcement officials.   Congress intended to provide a remedy to any class of persons, whose beliefs or associations placed them in danger of not receiving equal protection of the laws from local authorities.   While certain class traits, such as race, religion, sex, and national origin, *per se* meet this requirement, other traits also may implicate the functional concerns in particular situations.

## III

In the circumstances of this case, respondents are protected by § 2 and fall within this definition.   Port Arthur,

---

[18] See *id.*, at 368 (Mar. 31, 1871) (remarks of Sen. Sheldon) (right of persons to migrate and engage in legitimate traffic); *id.*, at 414 (Apr. 1, 1871) (remarks of Rep. Roberts) ("The carpet-bag is a sign of the vitality of our people"); *id.*, at 500 (Apr. 6, 1871) (remarks of Sen. Frelinghuysen) (Constitution protects migration of workers).

[19] See *id.*, at 653 (Apr. 13, 1871) (remarks of Sen. Osborn) (violence harms men who have migrated to the South for economic reasons).   Senator Morton echoed this theme, stating that the purpose of Klan violence was to drive out Republicans; this effectively barred Northern capital and immigration.   *Id.*, at App. 252 (Apr. 4, 1871).

Tex., was a self-professed union town. Respondents were threatened because of petitioners' view that nonunion workers were encroaching into an area that petitioners desired to keep union dominated. The identity or individuality of each of the victims was irrelevant to the conspiracy; the victims were attacked because of their pre-existing nonunion association. The conspiracy was similar to the Klan conspiracies Congress desired to punish in enacting § 2. In this union town, the effectiveness of local law enforcement protection for nonunion workers was open to question.[20] Petitioners intended to hinder a particular group in the exercise of their legal rights because of their membership in a specific class.

## IV

In *Griffin* v. *Breckenridge*, we reaffirmed our general approach to Reconstruction civil rights statutes including § 1985(3). Those statutes are to be given "'a sweep as broad as [their] language.'" 403 U. S., at 97, quoting *United States* v. *Price*, 383 U. S. 787, 801 (1966). In the 12 years since *Griffin*, that principle has not lost its vitality. I see no basis for the Court's crabbed and uninformed reading of the words of § 1985(3). I dissent.

---

[20] Although it is not necessary to plead ineffectiveness of local law enforcement in order to maintain a § 1985(3) action, some victims of the Port Arthur incident experienced difficulty in obtaining an injunction from a state court against future episodes of violence. See Tr. of Oral Arg. 33.