Samuel L. GILL, Appellant,

v.

FARM BUREAU LIFE INSURANCE COMPANY OF MISSOURI; Farm Bureau Town & Country Insurance Company of Missouri; Missouri Farm Bureau Finance Company; Missouri Farm Bureau Federation; C.R. Johnston; and Lowell Mohler, Appellees.

No. 89–2049EM.

United States Court of Appeals, Eighth Circuit.

Submitted March 15, 1990.

Decided July 2, 1990.

Rehearing and Rehearing En Banc Denied Aug. 14, 1990.

**1266**

John L. Oliver, Cape Girardeau, Mo., for appellant.

Ronald R. McMillin, Jefferson City, Mo., for appellees.

Before FAGG and WOLLMAN, Circuit Judges, and DUMBAULD *, Senior District Judge.

DUMBAULD, Senior District Judge.

■ Stated simply, the question before us in this appeal is whether a private busi-ness corporation engaged in selling insur-ance[1] may exercise its contractually estab-lished right to terminate its agency rela-tionship with appellant Samuel L. Gill[2] (who was a substantial producer of premi-ums for the company and of commissions for himself)[3] for the sole reason that he supported and was a fund-raiser for a can-didate for Congress running against the incumbent whom the insurance company favored. In other words, was cancellation under those circumstances a violation of the terms of 42 U.S.C. § 1985? The Dis-trict Court,[4] finding no cause of action un-der that provision, dismissed the case. 715 F.Supp. 945.[5] We affirm.

It may be helpful to enumerate certain areas of law that are *not* involved in the case at bar. Appellant invokes 42 U.S.C. § 1985, not the familiar 42 U.S.C. § 1983. The record before us does not disclose whether the company's opposition to the candidate supported by appellant was based upon any business-related reasons arising out of the interests of insurance companies affected by the potential ad-verse impact of consumer-oriented legisla-tion.[6] Thus no questions relating to the company's rights in the area of commercial free speech need to be considered.[7] We

---

* The Honorable Edward Dumbauld, U.S. Senior District Judge for the Western District of Penn-sylvania, sitting by designation.

1. According to paragraph 2 of the Complaint, appellant's contracts were with three defendant corporations (Farm Bureau Life Insurance Company of America, Farm Bureau Town and County Insurance Company of Missouri, and Missouri Farm Bureau Finance Company), which were affiliated with defendant Missouri Farm Bureau Federation, and were controlled by individual defendant C.R. Johnston, assisted by individual defendant Lowell Mahler.

   The contracts show that appellant was an in-dependent contractor and that the contracts may be "canceled by either party ... at any time upon the giving of notice in writing to the other party." [Joint Appendix, 13, 20].

2. For the nature of the contractual relationship and the right of cancellation, see note 1, *supra.*

3. The loss of commissions constitutes the com-pensatory damages claimed by Gill.

4. The Honorable Stephen N. Limbaugh, District Judge for the Eastern District of Missouri.

5. Upon dismissing the federal claim, the District Court had discretion to dismiss Gill's pendent claims under Missouri law. *U.M.W.A. v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). Since the order appealed from did not explicitly consider the merits of those claims, we construe it as dismissing them without prejudice. *Stokes v. Lokken,* 644 F.2d 779, 785 (8th Cir.1981).

6. In a Third Circuit case, *Novosel v. Nationwide Ins. Co.,* 721 F.2d 894, 896 (3rd Cir.1983), plain-tiff was an "employee at will" who was dis-charged for failure to support the insurance company's lobbying effort for a "No–Fault Re-form Act" before the State Legislature. *Novosel* was a diversity case, and the federal court's decision in his favor turned out to be a misap-prehension of Pennsylvania law. *Paul v. Lanke-nau Hospital,* — Pa. ——, 569 A.2d 346, 348 (1990).

7. See *FEC v. Mass. Citizens for Life, Inc.,* 479 U.S. 238, 259–63, 107 S.Ct. 616, 628–29, 93 L.Ed.2d 539 (1986); *Bolger v. Youngs Drug Prod-ucts Corp.,* 463 U.S. 60, 64–69, 103 S.Ct. 2875, 2878–82, 77 L.Ed.2d 469 (1983).

may assume *arguendo* that the political disagreement between the parties arises arbitrarily: from personal "chemistry," political ideology, economic interests, or family connections and traditions. No specific legislation is applicable such as requirements of the Voting Rights Act of 1965,[8] the National Labor Relations Act,[9] or laws protecting franchisees in the automobile business,[10] or forbidding discrimination in employment,[11] or regulating the insurance industry.[12] Nor are we required to reach appellee's argument that appellant is alleging a "bathtub conspiracy" contrary to *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769–71, 104 S.Ct. 2731, 2740–42, 81 L.Ed.2d 628 (1984) and *Cross v. General Motors Corp.*, 721 F.2d 1152, 1156 (8th Cir.1983). Likewise no new questions regarding legitimacy or desirability of restrictions on spending for political campaigns are involved.[13] Nor are we concerned with the Supreme Court's pronouncements concerning politically motivated discharges of employees by public officers.[14] We deal solely with interpretation of the scope and coverage of 42 U.S.C. § 1985.[15]

That provision reads, in pertinent part, as follows:

(c) If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or *if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person* as an elector for President or Vice President, or *as a Member of Congress* of the United States; *or to injure any citizen in person or property on account of such support or advocacy;* in any case of conspiracy set forth in this section, *if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages* occasioned by such injury or deprivation, against any one or more of the conspirators.[16]  [Italics supplied]

---

8. 42 U.S.C. § 1973 et seq.

9. 29 U.S.C. § 141 et seq.

10. 15 U.S.C. § 1221 et seq.

11. Such as 42 U.S.C. § 2000e–2.

12. 15 U.S.C. § 1012.

13. See *Buckley v. Valeo*, 424 U.S. 1, 51–54, 96 S.Ct. 612, 650–52, 46 L.Ed.2d 659 (1976).

14. See *Elrod v. Burns*, 427 U.S. 347, 357, 96 S.Ct. 2673, 2681–82, 49 L.Ed.2d 547 (1976).

15. Congress has extensive powers to protect federal elections against violence and corruption. *Ex parte Yarbrough*, 110 U.S. 651, 657–58, 662–63, 4 S.Ct. 152, 154–55, 157–58, 28 L.Ed. 274 (1884); *South Carolina v. Katzenbach*, 383 U.S. 301, 308, 86 S.Ct. 803, 808, 15 L.Ed.2d 769 (1966). We are to decide, not how far Congress *might* go, but how far *did* it go in 1871. The question in the case at bar is: did the cancellation of Gill's contracts violate the provisions of 42 U.S.C. § 1985(c) as enacted? In that connection, when interpreting the intent of the 1871 Congress with respect to the scope of its enactments, we must accept its views with respect to the extent and limitations of its constitutional powers, even if current constitutional law would allow larger latitude for the exertion of Congressional authority.

16. Subsection (a) of § 1985 deals with conspiracies to interfere with performance of official duties; subsection (b) with conspiracies to obstruct justice by interference with witnesses, jurors, or the enforcement of rights to the equal protection of the laws. The first part of subsection (c) deals with conspiracies to deprive any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or to prevent or hinder State authorities from giving or securing to all persons within such State the equal protection of the laws.

The above provisions of subsection (c) of § 1985 are the reviser's version of the long and less than lucid language of Section 2 of the Ku Klux Klan Act of April 20, 1871, 17 Stat. 13–14, which reads as follows:

*That if two or more persons ... shall conspire together for the purpose of in any manner impeding, hindering, obstructing, or defeating the due course of justice in any State or Territory, with intent ... by force, intimidation, or threat to prevent any citizen of the United States lawfully entitled to vote from giving his support or advocacy in a lawful manner towards or in favor of the election of any lawfully qualified person ... as a member of the Congress ..., or to injure any such citizen in his person or property on account of such support or advocacy, each and every person so offending shall be deemed guilty of a high crime*[17]*.... And if any one or more persons in any such conspiracy shall do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby any person shall be injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the person so injured or deprived of such rights and privileges may have and maintain an action for the recovery of damages occasioned by such injury or deprivation of rights and privileges against any one or more of the persons engaged in such conspiracy ...* [Italics supplied][18]

Scrutiny of the above pertinent portion of Section 2 indicates that the object of an actionable conspiracy relating to federal elections must be to impede, hinder, obstruct, or defeat "the due course of justice in any State or Territory." Such interference with the due course of justice must take place "with intent ... to prevent" (by force, intimidation, or threat) a citizen of the United States lawfully entitled to vote "from giving his support or advocacy in a lawful manner towards or in favor of the election of any lawfully qualified person ... as a member of the Congress." If any of the conspirators performs (or causes to be performed) "any act in furtherance of the object of such conspiracy" a civil action for damages occasioned thereby may be brought in federal court against any of the conspirators by "any person ... injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States."

As explained in *Kush v. Rutledge,* 460 U.S. 719, 724, 103 S.Ct. 1483, 1486, 75 L.Ed.2d 413 (1983):

Although § 2 contained only one long paragraph when it was originally enacted, that single paragraph outlawed five broad classes of conspiratorial activity. In general terms, § 2 proscribed conspiracies that interfere with (a) the performance of official duties by federal officers; (b) the administration of justice in federal courts; (c) the administration of justice in state courts; (d) the private enjoyment of "equal protection of the laws" and "equal privileges and immunities under the laws"; and (e) the right to support candidates in federal elections. As now codified in § 1985, the long paragraph is divided into three subsections.[19] One of the five classes of prohibited conspiracy is proscribed by § 1985(1), two by § 1985(2), and two by § 1985(3). The

---

**17.** The criminal portion of Section 2 was held unconstitutional in *U.S. v. Harris,* 106 U.S. 629, 639, 641, 643, 1 S.Ct. 601, 609, 610–11, 612–13, 27 L.Ed. 290 (1882), and was later repealed by Congress.

**18.** The complete text of Section 2 is set forth in *Kush v. Rutledge,* 460 U.S. 719, 727–29, 103 S.Ct. 1483, 1488–89, 75 L.Ed.2d 413 (1983). Its two sentences fill almost four pages in the report. The above extract is limited to language relating to the passage about federal elections, the subject-matter involved in the case at bar. Two

types of private conspiracy are proscribed: (1) prevention of or (2) punishment (by injury to person or property) for the exercise by a qualified voter of his right to vote.

**19.** "Until recently § 1985(c) was codified as § 1985(3)." Mark Fockely, "Comment, A Construction of Section 1985(c) in Light of Its Original Purpose", 46 Univ. of Chicago L.Rev. 402 (1979). That numerical designation is followed in *Kush.* We use the alphabetical designation throughout except in note 21 discussing *Kush.*

civil remedy for a violation of any of the subsections is found at the end of § 1985(3). *The reclassification was not intended to change the substantive meaning of the 1871 Act.*[20]

Three of the five broad categories, the first two and the fifth, relate to institutions and processes of the Federal Government—federal officers, § 1985(1); federal judicial proceedings, the first portion of § 1985(2); and federal elections, the second part of § 1985(3). The statutory provisions dealing with these categories of conspiratorial activity contain no language requiring that the conspirators act with intent to deprive their victims of the equal protection of the laws. Nor was such language found in the corresponding portions of § 2 of the 1871 Act.[21] [Italics supplied]

In the light of the foregoing analysis of the provisions enacted by Congress with respect to federal elections, it seems clear that the District Court correctly ruled that cancellation of Gill's contracts did not amount to a cause of action under the provisions invoked by Gill.

The shortcoming in Gill's case which first leaps to the eye is the lack of "force, intimidation, or threat."

Viewed in the light of its origin as a reaction against the "murders, whippings, and beatings committed by rogues in white sheets in the postbellum South,"[22] the Ku Klux Klan Act obviously meant to its framers, when it spoke of "force, intimidation, or threat" something much more serious and terrifying than a written notice of cancellation of a contract designating Gill as an agent to sell Farm Bureau insurance.

The colorfully sinister words at the beginning of § 1985(c) itself convey the picture of nightriders who "go in disguise upon the public highway or upon the premises of another" to commit their violent misdeeds. The victim "injured in his person or property" was surely contemplated by Congressmen in 1871 as suffering something more severe than loss of commissions as an insurance agent. Indeed, such loss in Gill's case was *damnum sine injuria,* for

**20.** Hence no significance attaches to any discrepancy or variation between the wording of the above-quoted passages from Section 2 and from the reviser's version in § 1985(c). The original text makes the object of the conspiracy the interference with "the due course of justice", the required intent to intimidate voters being ancillary to the main object of obstructing justice. Here, as in § 1985(b), obstruction of "the due course of justice" may have a wider application than merely to judicial proceedings. *Fowler v. Dept. of Education,* 472 F.Supp. 121, 122 (E.D.Va.1978). The revisers make intimidation of voters a separate object of conspiracy in itself. Both versions specifically require "force, intimidation, or threat."

**21.** The Court in *Kush* went on to note that *Griffin v. Breckenridge,* 403 U.S. 88, 92, 91 S.Ct. 1790, 1793, 29 L.Ed.2d 338 (1971), was a case under § 1985(3) where the purpose of the alleged conspiracy was to deprive the victim of equal protection of the laws. Hence the limitation in *Griffin* [403 U.S. at 102, 91 S.Ct. at 1798] requiring "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action" did not apply in *Kush,* brought under § 1985(2) and involving conspiracy to intimidate witnesses in federal court (the second category, described as (b) in the passage [460 U.S. at 724, 103 S.Ct. at 1486–87] quoted above). *Griffin* involved beating blacks with clubs, blackjacks, and pipes because one of them was thought to be a civil rights worker; it was clearly an equal protection claim. *Kush,* on the other hand, was a case relating to "institutions and processes of the Federal Government" [460 U.S. at 724, 103 S.Ct. at 1487], where by clear dictum category (e) relating to elections would likewise be classified along with category (b) and not be subject to the racial or other invidious discrimination requirement applicable to equal protection claims. It seems clear that the *Griffin* limitation is inapplicable in the case at bar, though Gill makes a colorable effort to comply with it by saying that the insurance companies wanted to "send a message" to other agents. Complaint, ¶ 7, Joint Appendix, 5.

**22.** Fockele, note 19, *supra,* 46 U. of Chi.L.R. at 402. A committee of Congress called hundreds of witnesses, took thousands of pages of testimony, and eventually issued a mammoth thirteen volume report describing Klan terrorism and atrocities. *Ibid.,* 408. See also Ken Gormley, "Private Conspiracies and the Constitution: A Modern Vision of 42 U.S.C. Section 1985(3)", 64 Tex.L.R. 527 (1985). As succinctly stated by Justice Holmes, with reference to an earlier statute, in *U.S. v. Mosley,* 238 U.S. 383, 386, 35 S.Ct. 904, 905, 59 L.Ed. 1355 (1915): "The source of this section in doings of the Ku Klux and the like is obvious and acts of violence were in the mind of Congress."

Gill's contracts themselves contained express provisions permitting cancellation upon written notice. These cancellation clauses constitute a second sufficient and independent ground for denying recovery to appellant Gill.[23]

Moreover, the Supreme Court squarely held in *Carpenters v. Scott,* 463 U.S. 825, 836–39, 103 S.Ct. 3352, 3360–61, 77 L.Ed.2d 1049 (1983), that economic injury was not the type of wrong for which § 1985(c) provides a remedy.[24] *Carpenters* likewise held that a First Amendment claim could not be actionable in the absence of State Action.[25]

The impact of these two propositions from *Carpenters* upon Gill's case is overwhelmingly fatal. For the essence of Gill's federal claim is the assertion of a First Amendment type right vindicating advocacy and association, and grounded upon economic coercion or conflict (with no possibility of invoking State Action). The basic thrust of Gill's complaint is the assertion of such an unmaintainable First Amendment claim.

■ On appeal, recognizing that the District Court has detected and revealed the weakness of his First Amendment claim,

Gill concedes that such a claim was "perhaps imprudently" included in his Complaint.[26] Hence he seeks to switch the ground of his claim so as to base it upon an independent right of national citizenship, relating to "institutions and processes of the federal government." This maneuver is unavailing, however, because the breadth of the federal right recognized in the case law (independently of the First Amendment) is not comprehensive enough to support an action to rectify Gill's grievance regarding cancellation of his contracts as an insurance agent.

The independent constitutional right relating to federal elections as part of the basic institutions and processes of the national government is limited, under existing case law, to the right to vote—to cast a ballot and have it honestly counted. *U.S. v. Classic,* 313 U.S. 299, 315, 318, 61 S.Ct. 1031, 1037–38, 1039, 85 L.Ed. 1368 (1941); *U.S. v. Mosley,* 238 U.S. 383, 386, 35 S.Ct. 904, 905, 59 L.Ed. 1355 (1915). Significantly, Gill does not allege that he was actually deterred from voting by any "force, intimidation, or threat." We may confidently assume that no hooded horseman brandishing rope and pistol, or ruffian in more modern garb, drove him *vi et armis* from

23. Even without the express provisions contained in the clauses permitting cancellation, the companies would have the right to choose the parties with whom, and the terms upon which, they will deal. *U.S. v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919).

24. The economic conflict in *Carpenters* was between union and non-union labor. The economic pressure on Gill by the insurance company was nothing more than the traditional carrot and stick technique long familiar in American politics. Sam Adams, a signer of the Declaration of Independence, when seeking office in Massachusetts wooed votes of tailors by ordering new clothes. When William Jennings Bryan sought the presidency in 1896, bankers notified borrowers that their notes would not be renewed if Bryan were elected, and employers notified workers not to return to work after the election if Bryan won, as the plants would be closed in that event. Wayne C. Williams, *William Jennings Bryan* (1936) 190, 195.

25. 463 U.S. at 831, 103 S.Ct. at 3357. Although *Carpenters* was a 5–4 decision, a twofold argument sustains the inherent correctness of that

conclusion. The First Amendment by its own terms is addressed to Congress, not to individuals. It provides that

Congress shall make no law respecting the establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

Likewise, the due process clause of the Fourteenth Amendment, pursuant to which the Supreme Court, by the process of "selective incorporation," has enforced the contents of the First Amendment against the States, is itself directed to them and not to individuals. It provides that

No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

On "selective incorporation" see Henkin, " 'Selective Incorporation' in the Fourteenth Amendment," 73 Yale L.Rev. 74 (1963).

26. Appellant's reply brief, 27.

the polls. What he complains of is not wrongful conduct unless the First Amendment can be invoked.

■ There is no recognized constitutional right to be a fund-raiser, free from governmental regulation or private pressure.[27] Even the right to spend one's own money to support a candidacy is based upon First Amendment considerations (and hence requires State involvement).[28]

Accordingly, for the foregoing reasons, the judgment of the District Court is

AFFIRMED.

---

**27.** In the absence of specific constitutional or statutory language sufficient to create such a right, Gill's claim fails to satisfy the requirements of any of the four categories of conspiracy proscribed by § 1985(c).

**28.** See *Buckley v. Valeo,* note 13, *supra,* 424 U.S. at 51–54, 96 S.Ct. at 650–52, and note 25, *supra.*