Walter BELL, Plaintiff,

v.

MIKE FORD REALTY COMPANY, et al., Defendants.

Civ. A. No. 93–0173–BH–S.

United States District Court,
S.D. Alabama,
Southern Division.

June 6, 1994.

Mack B. Binion, Alex F. Lankford, IV, Briskman and Binion, P.C., Mobile, AL, for Walter Bell.

Caine O'Rear, III, Mobile, AL, for Mike Ford Realty Co. and Mike Ford.

Horace Moon, Jr., William A. Donaldson, Esq., Mobile, AL, for Phyllis Dade.

Norborne C. Stone, Jr., Bay Minette, AL, David Hamby, Jr., Mobile, AL, for William R. Annan.

James T. Fousekis, Lori A. Shoemaker, Steinhart & Falconer, San Francisco, CA, for Time Inc. and Time Warner Inc.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HAND, Senior District Judge.

This action is before the court on two motions for summary judgment, one from defendants Mike Ford and Mike Ford Realty Company (tab 32), and one from defendant William Annan (tab 35).

The action arises from the defendants' alleged conduct in attempting to sell real estate near Point Clear, in Baldwin County, Alabama, and the plaintiff's attempt to buy it.

Plaintiff Walter Bell, who is black, alleges in count one of his complaint that the defendants discriminated against him on the basis of his race or color in violation of Section 805(a) of the Fair Housing Act, 42 U.S.C. § 3605(a). He also alleges they deprived him of his right, as a United States citizen, to purchase real property without regard to his race or color in violation of 42 U.S.C. § 1982. Plaintiff's Second Amended Complaint (tab 24), 3–4.

In count two, Bell alleges the defendants violated 42 U.S.C. § 1985(3) by engaging in an intentional, malicious, willful and wanton conspiracy to deprive him of his right to purchase property without regard to his race or color. He claims the defendants refused to negotiate the sale of the property with him and made it unavailable by taking it off the market. *Id.* at 4–5.

In count three, Bell alleges that when defendant Annan refused to negotiate with him after he made two bona fide offers, and made the property unavailable by taking it off the market, he violated 42 U.S.C. §§ 3604(a) and (d). Furthermore, he alleges Annan deprived him of his right to purchase real property without regard to his race or color as provided by 42 U.S.C. § 1982. *Id.* at 5–6.

As a result of these alleged incidents, Bell claims he has suffered humiliation, emotional distress, mental anguish, embarrassment, inconvenience, and deprivation of his constitutional rights; incurred expenses and lost time in connection with the real property in question; lost the investment value/appreciation of the real property; and spent additional money to buy comparable property at another location. *Id.* at 4–6.

From the respective defendants on each of the three counts, Bell seeks compensatory and punitive damages and prays that the court award him his costs, reasonable attorney's fees, and such relief as the court may deem just and proper. *Id.*

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

## Findings of Fact

1. Plaintiff Walter Bell resides in Mobile County, Alabama.

2. Defendant Mike Ford is the owner of defendant Mike Ford Realty, a sole proprietorship in Fairhope, Alabama, which sells residential real estate.

3. Melville Dowling owns real property on the eastern shore of Mobile Bay near Point Clear, in Baldwin County, and other real property on Breamwood Avenue in Mobile, Alabama.

4. Dowling is an aunt of Donald Annan and his brother, defendant William Annan. She has lived with Donald Annan and his wife, Joyce Annan, at their home in Fairhope most of the time since the late 1980s. Joyce Annan has provided most of the care for her husband's invalid aunt.

5. By March 1992, caring for Dowling had become so stressful for Joyce Annan that the family reluctantly decided to admit Dowling to a nursing home. (Depo. of Joyce Annan, 10–11; Depo. of William Annan, 26.) Dowling was admitted on March 2, 1992.

6. To pay Dowling's nursing-home bills, Joyce Annan and her brother-in-law, defendant William Annan, agreed to sell both Dowling's Point Clear property and other real property in Mobile. (Joyce Annan depo. at 15; William Annan depo. at 27, 31–33, 42.) They discussed at the time that should Dowling come out of the nursing home, there would be no need to sell her property. (Joyce Annan depo. at 15–16; William Annan depo. at 20.)

7. Dowling had granted William Annan her power of attorney.

8. William Annan went to Ford to list Dowling's Point Clear property for sale on March 6, 1992. (William Annan depo. at 33–34; declaration of Mike Ford.) Annan told Ford at that time that they needed to sell the property to pay his aunt's nursing-home expenses. (Depo. of Mike Ford, 53.) The signed listing agreement was returned to Ford by William Annan and Joyce Annan on April 29, 1992. William Annan specified that the sales price was $165,000. (Ford decl.;

Ford depo. at 52; William Annan depo. at 34.) Once the property was listed for sale, a number of offers to purchase were submitted, as set forth below.

9. Soon after being admitted to the nursing home, it became clear that Dowling wanted to leave. She did not cooperate with the nursing-home staff and desperately wanted to go home to live. (Depo. of June Heathcock, assistant administrator at the nursing home, 25–26; Joyce Annan depo. at 17.)

10. Joyce Annan felt sorry for Dowling, so much so that by July 1992 she decided to bring her back home to live with her and her husband again. (Joyce Annan depo. at 19.) This decision was made by Joyce Annan alone and communicated to the nursing-home staff about one week prior to July 10, 1992. (Heathcock depo. at 25; Joyce Annan depo. at 19–20.) Joyce Annan also discussed with the nursing-home staff prior to July 10, 1992, the possibility of retaining home health-care services for Dowling. (Depo. of John White, 11–12.)

11. Before Joyce Annan brought Dowling home, she had to undertake such tasks as painting the bedroom Dowling would use, and ordering a bed and wheelchair for her. On July 7, 1992, Joyce Annan ordered a wheelchair and hospital bed. (Joyce Annan depo. at 36–37; William Annan depo., Ex. 8.) These items were delivered to the Annans' home on July 9, 1992. (Joyce Annan depo. at 36–37; William Annan depo. at 25, Ex. 8.) The doctor's orders for Dowling's discharge from the nursing home were entered on July 9, 1992. (Heathcock depo. at 27, 29.) Dowling was discharged from the nursing home on July 10, 1992. (Heathcock depo., Ex. 3.)

A few days before taking Dowling home, Joyce Annan told her brother-in-law, defendant William Annan, of her plan. By that time, his efforts to sell Dowling's Point Clear property were well under way.

12. Prior to Dowling's discharge from the nursing home, five offers to purchase were made on the subject property. Those offers were as follows: (1) Bousson offer on May 2, 1992, for $115,000; (2) Crosby offer on May 7, 1992, for $100,000; (3) Loeb offer on May 8, 1992, for $130,000; (4) Straub offer on

June 8, 1992, for $145,000; and (5) the plaintiff's offer on June 12, 1992, for $140,000. (William Annan depo. at 24, 89–90, Exs. 6, 7.) Ford communicated all of these offers to William Annan. (Ford depo. at 38–39.)

13. William Annan rejected each of these offers in the same manner: by writing at the bottom of the offer sheet that the sales price was $165,000. (William Annan depo., Exs. 6–7.) William Annan does not recall the specific terms of any of the offers; he only looked at the figure being offered and rejected each one, stating that the sales price was $165,000. (William Annan depo. at 76, 89–90.) William Annan never considered making any counteroffers for a lower sales price with respect to *any* of the offers received. (*Id.* at pp. 78–79.) William Annan advised Joyce Annan as to the amounts of the offers made on the house but never gave her the name or race of any of the offerors. (Joyce Annan depo. at 30–31, 41–42.)

14. Bell first spoke with someone at Ford Realty about the Point Clear property about June 5, 1992. (Depo. of Walter Bell, 28, 33–34.) That day someone at Ford Realty told Bell that the price for the property was $165,000. (*Id.* at 29–30.) Phyllis Dade, a real-estate agent at Ford Realty, showed Bell the Point Clear property. (*Id.* at 41.) Dade also advised Bell that the listing price for the property was $165,000. *Id.*

15. On June 12, 1992, Bell executed an offer to purchase the subject property for $140,000 subject to certain conditions. (*Id.* at 67, Ex. 5.) This offer was signed by Bell in Dade's presence in Ford's office. (*Id.* at 67–68.) The offer was immediately submitted to William Annan, who declined it. (William Annan depo. at 58–59.) In declining the offer, William Annan wrote on the bottom of the offer sheet as he had done with the other offers: "Declined. Price to be $165,000 cash." (William Annan depo. at 59, Ex. 6.)

16. On the next day, June 13, 1992, Dade called Bell and advised him that his offer had been declined. (Bell depo. at 71–72.) Dade told Bell at that time that his offer had been declined because "the seller was sitting fast on his price of 165 [$165,000]." (*Id.* at 74.) Bell clearly understood that his offer was rejected because he did not offer the sales price of $165,000. (*Id.* at 108–109.) William Annan testified that he would have sold the subject property at that time to anyone, specifically including Bell knowing that he was black, who offered the $165,000 sales price. (William Annan depo. at 82–83.)

17. Bell, however, was unwilling to tell anyone from Ford Realty what his best offer would be. (Bell depo. at 76.) Bell understood that if he had offered the $165,000 sales price to Annan, the listing agreement would have been honored. (*Id.* at 76–77.)

18. Dade never exhibited to Bell any difficulty or uneasiness about Bell's race as it related to his offer or the transmission of the offer to the sellers. (*Id.* at 79.) Bell personally thought Dade handled the transaction in a very forthright manner. *Id.*

19. Within a week prior to July 10, 1992 (the day of Dowling's discharge from the nursing home), Joyce Annan informed William Annan that she was going to remove Dowling from the nursing home and return her to Joyce Annan's home. (Joyce Annan depo. at 42.) At that time, Joyce Annan and William Annan agreed that they no longer needed to sell the Point Clear property. (Joyce Annan depo. at 43.) William Annan recalls that he told Joyce Annan on either July 9, 1992, or July 10, 1992, that he would take the property off the market. (William Annan depo. at 49.)

20. The sole reason that the Annans decided to take the subject property off the market was that they no longer needed to sell the property to cover nursing-home expenses since Dowling was being taken out of the nursing home. (William Annan depo. at 42; Joyce Annan depo. at 16.) William Annan's knowledge that Bell is black did not play any part in his decision to remove the subject property from the market. (William Annan depo. at 84.) Joyce Annan, who concurred in

the decision, did not even know Bell is black. (Joyce Annan depo. at 38.)

21. On or about Sunday afternoon immediately prior to July 10, 1992, Bell called Dade and advised her that he was going to make a second offer on the property, but he did not tell her the amount of the offer. (Bell depo. at 84–85.) Dade at that time mailed the offer sheet to Bell, which he received on Wednesday of that week. (Bell depo. at 85–86, Ex. 6.)

22. The Sunday before July 10, 1992, was Sunday, July 5. The Wednesday before July 10, 1992, was Wednesday, July 8.

23. Dade did not tell Mike Ford that Bell would be submitting a second offer. (Ford depo. at 39–40.) Ford himself did not know that a second offer would be forthcoming. (*Id.* at 82.) Between the time that Bell indicated to Dade that a second offer would be made and the time of the actual receipt of the offer, there was no communication between anyone at Ford Realty and William Annan that an offer was anticipated. (*Id.* at 37–39, 82; William Annan depo. at 49.)

24. On Friday, July 10, 1992, at around 2:00 p.m., Bell delivered to Dade a signed offer for $150,000 on the Point Clear property. (Bell depo. at 86–87, Ex. 6.) This was still $15,000 less than the specified sales price. Dade expressed no problem with presenting the offer to the sellers. (Bell depo. at 88.) Bell never indicated to anyone at Ford Realty that he was willing to offer $165,000. (*Id.* at 97.)

25. As he had done with the prior offers, Ford called William Annan to communicate Bell's second offer. (Ford depo. at 40, 79; William Annan depo. at 55.) Ford told Annan that he had an offer for $150,000, and Annan immediately replied that the property was off the market because his aunt, Dowling, was out or coming out of the nursing home. (William Annan depo. at 47–48, 55–56; Ford depo. at 40.) William Annan told Ford that the property was off the market before Annan knew who had submitted the offer Ford called about; Ford did not even state at that time who the offeror was. (Wil-

liam Annan depo. at 48, 58, 86–87; Ford depo. at 79.)

26. When Ford called William Annan to tell him about the $150,000 offer, Ford was unaware, until Annan told him during that conversation, that Annan was taking the property off the market. (Ford depo. at 56, 78, 79.) Ford believed Annan when he said that the property was being taken off the market because Dowling was out or coming out of the nursing home. (*Id.* at 81.) William Annan never indicated, nor did Ford believe, that Annan was taking the property off the market because Bell is black. (*Id.* at 80–82.) Annan did not even know that it was Bell who submitted the $150,000 offer when Annan told Ford that the subject property was off the market. (William Annan depo. at 48, 58, 86–87; Ford depo. at 79.)

27. Even though the listing agreement was initially designated to run through September 6, 1992, Ford, as a customary and regular business practice, never challenges the right of a property owner to remove his property from the market before a listing agreement expires. (Ford depo. at 48–50.) As a matter of procedure, Ford always requests a written explanation from any owner who removes his property from the market before a listing agreement expires. (*Id.* at 9.) Ford asked William Annan to submit a written explanation, and Annan provided Ford with a note saying that the subject property no longer needed to be sold because the reason for the sale—to pay for nursing-home expenses—no longer existed. (William Annan depo. at 57, Ex. 6.)

28. Ford advised Bell on July 14, 1992, that Annan had taken the property off the market because Dowling was coming out or had come out of the nursing home and the property no longer needed to be sold to pay nursing-home expenses. (Bell depo. at 90–91.) Bell admits that he had learned "somewhere along the way" that the subject property was being sold to pay Dowling's nursing-home expenses, but he cannot specifically recall whether he learned that before July 14, 1992. (*Id.* at 98.)

29. Bell is not aware of any terms presented to him by Annan which were different

from the terms presented to other prospective buyers. (*Id.* at 108.)

30. Neither Ford, Dade nor anyone else at Ford Realty had any discussions with William Annan or Joyce Annan about taking the subject property off the market because Bell is black. (William Annan depo. at 83; Joyce Annan depo. at 37; Ford depo. at 80.) Neither Ford, Dade nor anyone else at Ford Realty entered into any combination, conspiracy, communication or agreement with William Annan or Joyce Annan to participate in taking the subject property off the market because Bell is black. (William Annan depo. at 83; Joyce Annan depo. at 37; Ford depo. at 80.) Bell concedes that he has no knowledge that Ford discriminated against him or that Ford or anyone else at Ford Realty entered into any combination, agreement or conspiracy with Annan to deprive Bell of obtaining the subject property because of his race. (Bell depo. at 66–67.)

## II. Conclusions of Law

### A. The Fair Housing Act Claim

 1. The three-part test developed in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), a Title VII employment-discrimination case, governs in cases brought under the Fair Housing Act. *Secretary, United States Dep't of Housing & Urban Dev. on behalf of Herron v. Blackwell,* 908 F.2d 864, 870 (11th Cir.1990).[1] Under this test, the plaintiff must make out a prima facie case of discrimination by a preponderance of the evidence. If the plaintiff succeeds, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for its action. *Id.* If the defendant satisfies this burden of articulation, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the reason proffered by the defendant is pretextual (*i.e.,* illusory), *id.,* citing *McDonnell Douglas,* 411 U.S. at 802, 804, 93 S.Ct. at 1824, 1825, and the real reason was the plaintiff's race. *St. Mary's Honor Center v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742,

2749, 125 L.Ed.2d 407 (1993) (employment-discrimination case), citing *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

 2. A plaintiff establishes a prima facie case by proving: (1) that he is a member of a racial minority; (2) that he applied for and was qualified to purchase the property; (3) that the owner rejected the plaintiff's offer; and (4) that the property remained available thereafter. *Blackwell,* 908 F.2d at 870.

 3. Bell submitted two offers, the first one for $140,000 and the second one for $150,000. However, the specified sales price for the Dowling property was at all times $165,000. The owners/sellers of the property never indicated any intention of accepting an offer lower than $165,000 or even negotiating with any offeror who made an offer below $165,000. Bell never offered $165,000, nor did he ever indicate to the defendants that he was prepared or willing to offer $165,000. Therefore, Bell never demonstrated that he was qualified to purchase the house, as required to establish a prima facie case.

4. In addition to Bell's failure to fulfill the second factor, he also fails to meet the conditions of the fourth requirement. William Annan decided to remove the property from the market before he received Bell's second offer. The subject property did not remain available to anyone of any race after Bell's $150,000 offer was submitted and declined. Thus, Bell was not treated any differently than any other individuals interested in purchasing the property.

5. Because Bell cannot show that he meets the four requirements of a prima facie case, no presumption of racial discrimination exists, and summary judgment for the defendants on the § 3605(a) claim is proper.

6. Even if Bell had been successful in establishing a prima facie case, the defendants have established a non-racial reason for re-

---

1. The plaintiff must "establish that race played some role in the actions" of the defendants. *Sofarelli v. Pinellas County,* 931 F.2d 718, 723 (11th Cir.1991), citing *United States v. Mitchell,*

580 F.2d 789, 791–92 (5th Cir.1978). The *McDonnell Douglas* test is the means by which the plaintiff must "establish that race played some role in the actions" of the defendants.

moving the Dowling property from the market.

7. The Eleventh Circuit requires only that defendants articulate a legitimate, nondiscriminatory reason for their actions. *Blackwell,* 908 F.2d at 871, citing *Burdine,* 450 U.S. at 253–56, 101 S.Ct. at 1093–95. This is a burden of articulation only, not a burden of persuasion. *Burdine,* 450 U.S. at 256–58, 101 S.Ct. at 1095–96. In *Burdine,* the Supreme Court held that the court of appeals had erred in placing an overly heavy burden on the defendant after the plaintiff established a prima facie case:

> We have stated consistently that the employee's prima facie case of discrimination will be rebutted if the employer articulates lawful reasons for the action; that is, to satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus. The Court of Appeals would require the defendant to introduce evidence which, in the absence of any evidence of pretext, would *persuade* the trier of fact that the employment action was lawful. This exceeds what properly can be demanded to satisfy a burden of production.

*Id.* at 257, 101 S.Ct. at 1096 (emphasis in original).

8. Once the defendant satisfies this burden of articulation, any presumption of discrimination "drops out of the picture," *St. Mary's Honor Center,* —— U.S. at ——, 113 S.Ct. at 2749, citing *Burdine,* 450 U.S. at 255, 101 S.Ct. at 1094–95, and the burden shifts back to the plaintiff.

9. The testimony of William Annan and Joyce Annan that the removal of Dowling from the nursing home was the reason for taking the subject property off the market satisfies the defendants' burden of articulation. It goes even further by establishing that Dowling's discharge from the nursing home was the sole reason for removing the property from the market. Thus, the defendants have more than satisfied their burden in this case.

10. After the defendants have articulated a legitimate, nondiscriminatory reason for their actions, the plaintiff has the ultimate burden of proving that this proffered reason is a pretext for racial discrimination. *Blackwell,* 908 F.2d at 871. In this case, Bell does not show that the defendants' reason is a pretext and that the real reason for the decision was his race.

11. Bell's first offer for $140,000 was declined by William Annan because the firm asking price was $165,000. His second offer of $150,000, though communicated to Annan after Annan decided to remove the property from the market, was also too low. Four other offers by other individuals were likewise declined because they did not meet the firm $165,000 sales price. The evidence does not support Bell's contention that he was treated differently than others making offers on the property.

12. Bell's failure to carry his ultimate burden of persuasion mandates summary judgment for the defendants on the § 3605(a) claim.

### B. The § 1982 Claim

13. Courts adjudicating § 1982 actions have adopted the three-part test used in Fair Housing Act litigation. *E.g., Houston v. Benttree, Ltd.,* 637 F.2d 739 (10th Cir.1980), *cert. denied,* 451 U.S. 938, 101 S.Ct. 2018, 68 L.Ed.2d 325 (1981).

14. As discussed under the *McDonnell Douglas* framework, in order to establish a § 1982 claim, the plaintiff must make out a prima facie case of discrimination by a preponderance of the evidence. Courts have held that to establish a prima facie case, the plaintiff must prove: (1) that he is a member of a racial minority; (2) that he applied for and was qualified to rent or purchase certain property or housing; (3) that he was rejected; and (4) that the housing or rental opportunity remained available thereafter. *Metro Fair Hous. Services, Inc. v. Morrowood Garden Apartments, Ltd.,* 576 F.Supp. 1090, 1094 (N.D.Ga.1983), citing *Phiffer v. Proud Parrot Motor Hotel,* 648 F.2d 548 (9th Cir.1980), *Harper v. Hutton,* 594 F.2d 1091 (6th Cir.1979); *rev'd on other grounds,* 758 F.2d 1482 (11th Cir.1985). To

establish a violation of § 1982, a plaintiff in the Eleventh Circuit must further show that a defendant rejected a qualified offer to purchase or rent property and that the defendant intended to discriminate racially. *Terry Properties, Inc. v. Standard Oil Co.*, 799 F.2d 1523, 1534 (11th Cir.1986).

15. In this case, because neither direct nor circumstantial evidence indicates any intent on the part of the defendants to discriminate against Bell due to his race, the § 1982 action against Ford is unfounded.

16. As with the Fair Housing Act claim, Bell does not meet the requirements necessary to make out a prima facie case of discrimination. As established above, Bell was never "qualified" to purchase the property because he did not offer the specified sales price.

17. Likewise, Bell fails to satisfy the fourth requirement, because the property did not remain available to others after Bell's offer was declined. Because Bell cannot show that he meets the four requirements of a prima facie case, summary judgment for the defendants on the § 1982 claim is appropriate.

18. Even if Bell had established a prima facie case, the three-step analysis under *McDonnell Douglas* is equally applicable to § 1982 claims. If a prima facie case is made, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for his action. *See Phillips v. Hunter Trails Community Ass'n*, 685 F.2d 184, 190 (7th Cir.1982); *cf., Phiffer*, 648 F.2d at 552. This is a burden of articulation only, not a burden of persuasion. *Burdine*, 450 U.S. at 256–58, 101 S.Ct. at 1094–95. The analysis under § 1982 is, therefore, the same as under § 3605(a).

19. The defendants have articulated legitimate, nondiscriminatory reasons for their actions. Bell's second offer would have been rejected regardless of his race, and the property would have been removed from the market regardless of whether Bell had ever made a second offer on the property. This showing by the defendants is more than sufficient to satisfy the defendants' burden of articulation.

20. Again, Bell has not shown that the defendants' articulated reason is a pretext and that the real reason for the decision was his race.

### C. The § 1985(3) Claim

21. The Eleventh Circuit has relied upon two Supreme Court cases, *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), and *United Bhd. of Carpenters & Joiners, Local 610 v. Scott*, 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983), in examining conspiracy claims brought under § 1985(3). The elements of a § 1985(3) claim are: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Lucero v. Operation Rescue of Birmingham*, 954 F.2d 624, 627 (11th Cir. 1992), quoting *Scott*, 463 U.S. at 828–29, 103 S.Ct. at 3356. *See also Arnold v. Bd. of Educ.*, 880 F.2d 305, 317 (11th Cir.1989); *Player v. Alabama Dept. of Pensions & Sec.*, 400 F.Supp. 249 (M.D.Ala.1975), *aff'd*, 536 F.2d 1385 (5th Cir.1976) (each citing the same elements for a claim under § 1985(3)).

22. Under *Griffin*, a plaintiff must demonstrate that there is "some racial ... invidiously discriminatory animus behind the conspirators' action." *Lucero*, 954 F.2d at 630 (Kravitch, J., dissenting), quoting *Griffin*, 403 U.S. at 102, 91 S.Ct. at 1798; *Scott*, 463 U.S. at 829, 103 S.Ct. at 3356, quoting *Griffin*, 403 U.S. at 102, 91 S.Ct. at 1798; *see also Silkwood v. Kerr–McGee Corp.*, 637 F.2d 743, 748 (10th Cir.1980), *cert. denied*, 454 U.S. 833, 102 S.Ct. 132, 70 L.Ed.2d 111 (1981). There is no evidence that the defendants possessed any such animus in this case.

23. Moreover, to prove a conspiracy a plaintiff must show that: (1) the defendant had an agreement with at least one other person and participated or caused something to be done in furtherance of the agreement; (2) the agreement was to deprive the plaintiff of a protected right; (3) the

defendants were motivated by a dislike or hateful attitude toward a specific class of people and that the plaintiff was a member of that class; and (4) the conspiracy caused deprivation or injury to the plaintiff. *Chambers v. Omaha Girls Club*, 629 F.Supp. 925, 935 (D.Neb.1986), citing *Griffin*, 403 U.S. at 103–04, 91 S.Ct. at 1798–99. The plaintiff must show that the defendants were motivated by racial or class-based invidious discrimination to recover under § 1985(3). *Arnold*, 880 F.2d at 317; *Weeks v. Benton*, 649 F.Supp. 1297, 1299 (S.D.Ala.1986).

■ 24. There is no evidence of any conspiracy to deprive Bell of an opportunity to purchase the Dowling property because of his race. Mike Ford, William Annan and Joyce Annan all deny that any such conspiracy existed, and Bell concedes that he has no evidence of it. The decision to remove the Dowling property from the market was made solely by William Annan and Joyce Annan. Ford had no participation in or influence over this decision. Ford believed William Annan when he told Ford that the property was taken off the market because they no longer needed to sell the property to pay nursing-home expenses. This was consistent with Annan's statement to Ford when the property was first listed.

25. Accordingly, the defendants are entitled to summary judgment on the § 1985(3) claim.

■ 26. To oppose summary judgment, the plaintiff must do more than assert conclusory allegations. He must set forth specific facts. Mere conclusory allegations will not prevent an entry of summary judgment for the defendant. *E.g., Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir.1990). The plaintiff's response (tab 41) to the defendant's summary-judgment motion and brief is replete with unsupported conclusory allegations, none of which create a genuine issue of material fact. By way of example, the court notes that the plaintiff asserts:

a. The defendants repeatedly contradict each other "in an attempt to explain their repugnant discriminatory conduct." (introduction, p. 1.)

b. When the plaintiff Bell and his wife visited the Point Clear property, Mrs. Bell "observed that a neighbor ... was flying a Confederate flag and remarked to [Mr.] Bell that someone was sending him a message." (pp. 4–5.) The plaintiff does not specify which Confederate flag, but his apparent assumption that a Confederate flag is inherently racist is wrong.

c. When Bell learned that the Point Clear property was being taken off of the market, he "knew this was more than a coincidence." (p. 4.) "Ford's explanation led Bell to conclude that Ford was assisting Annan in a hastily constructed, poorly planned cover up of discriminatory conduct." (p. 5.) Bell offers no persuasive support for his racial accusations.

d. "Additional evidence of a cover up was a hurriedly composed note Annan wrote Ford; supposedly *at Ford's request*." (Emphasis in original) (p. 6.) Ford has explained that he asks customers who take property off the market to provide a written explanation. Moreover, he was concerned that he could be sued in this instance. (Ford depo. at 33–34.) This lawsuit has confirmed Ford's fears.

e. "Bell had almost $165,000 cash and intended a mortgage to fund the balance and improvements he intended." (p. 7.) Bell, however, never made an offer of $165,000. By his argument, Bell unpersuasively contends that the defendants should have read his mind, even though he admits he was unwilling to tell them what his intentions were.

f. "Bell was the *only* offeror who, after submitting an offer, was told that the property was removed from the market." (p. 12.) Bell was also the only person who made an offer after the Annans decided to take the property off the market.

g. "William Annan never instructed Ford to tell prospective buyers that his $165,000 asking price was firm or not negotiable." (p. 13.) This is immaterial. Annan's consistently rejecting offers below $165,000 indicates that the price was firm and not negotiable. In any event, Dade told Bell after his first offer was declined that William Annan "was

**1560**

sitting fast on his price of 165." (Bell depo. at 74.)

h. The Annans actually intended to keep Dowling in the nursing home for a short time, (pp. 14–16) and Dowling left the nursing home the same day that Bell submitted his $150,000 offer. (pp. 17–18.) This creates no genuine issue of material fact, in part because the offer Bell submitted was below $165,000.

i. "In all likelihood, Dade told Ford that Bell was coming back with a second offer and Ford communicated same to William or [sic] Annan." (pp. 29–30.) This unsupported statement is contradicted by the testimony of the defendants.

27. Racial discrimination is a challenge which America's Constitution and statutes command the country confront. Courts in particular must confront racial discrimination because it is illegal. *E.g.,* U.S. Const. amend. 14. Individuals and institutions other than courts must also confront it because it is morally repugnant.

In confronting racial discrimination, however, institutions and individuals must act responsibly. Accusations of racism lacking sufficient support exacerbate racial tensions. They are extremely difficult to refute, in part because they often present the accused with the impossible task of proving a negative. No matter how effectively the accused refute the charges, some people will always wonder whether they were true. Such is the challenge with which the defendants in this action are presented.

Sometimes it is possible to redeem the accused, but it may require tremendous time, effort, legal fees and costs. The accusations and the process of redemption can damage reputations and cause stress imaginable only to those who have endured it. It is despicable that those are sometimes among the purposes of the accusations. This newer racism is as morally repugnant as the old racism. Whether this newer racism is illegal, and whether anyone involved in this case has engaged in it, is a question not before this court.

**DONE.**

## JUDGMENT

There is no genuine issue of material fact with regard to any of the plaintiff's claims against any of the defendants. The defendants are entitled to judgment as a matter of law. Accordingly, the defendants' motions for summary judgment are **GRANTED.**

It is therefore **ORDERED, ADJUDGED,** and **DECREED** that judgment be entered in favor of the defendants Mike Ford, Mike Ford Realty, and William Annan, and against the plaintiff, Walter Bell.

Defendant William Annan's previously filed motion (tab 38) for attorneys fees pursuant to 42 U.S.C. § 3613(c)(2) remains.

**SO ORDERED.**