**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 7, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ROBERT YAKLICH,

        Plaintiff - Appellant,

    v.

GRAND COUNTY, a Political
Division of the State of Colorado, by
and through its BOARD OF COUNTY
COMMISSIONERS OF THE
COUNTY OF GRAND, COLORADO;
ROBERT ANDERSON, in his official
capacity; DUANE DAILEY, in his
official capacity; JAMES
NEWBERRY, in his official capacity;
TABERNASH MEADOWS WATER
AND SANITATION DISTRICT;
IRENE COOK, in his official capacity
as President of the Board of Directors
of Tabernash Meadows Water and
Sanitation District; LAURALEE
KOURSE, individually and as
manager, Tabernash Meadows Water
and Sanitation District; BETSY
ELIZABETH REDFIELD, in her
official capacity as Bookkeeper,
Tabernash Meadows Water and
Sanitation District; BOARD OF
DIRECTORS FOR TABERNASH
MEADOWS WATER AND
SANITATION DISTRICT; BOB
ALEXANDER, in his official
capacity; DOUGLAS OURI, in his
official capacity; GRETCHEN
BRETZ, in her official capacity; MR.
STOVALL, in his official capacity;
LURLINE UNDERBRINK, in her
official capacity as County Manager,

No. 05-1563

D. Colo.

(D.C. No. 1:05-CV-01081-LTB-OES)

Grand County; WILLIAM GRAY, in his official capacity as Acting Director of Planning, State of Colorado, Grand County Department of Planning and Zoning; COLORADO BOND SHARES, a security broker; FRED KELLY, in his capacity as President of Colorado Bond Shares; BANK OF THE WEST, a California Corporation authorized to do business in Colorado; and TERESA TURNER, in her capacity as President of Bank of the West,

Defendants - Appellees.

# ORDER AND JUDGMENT[*]

Before **O'BRIEN**, **BALDOCK**, and **HOLMES**, Circuit Judges.

This appeal arises out of Tabernash Meadows, LLC's (Tabernash) failed attempt to create a subdivision called Pole Creek Valley in Grand County, Colorado. Robert Yaklich, the founder and sole owner of Tabernash, filed suit against various defendants, who moved to dismiss. The district court granted the motions. We AFFIRM in part, REVERSE in part, and REMAND as set forth in

---

[*]This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

this Order and Judgment.

## I. BACKGROUND

Pole Creek Valley is located approximately two miles southwest of Tabernash, Colorado, on Highway 40. It consists of 168 acres of land subdivided into 113 single-family, multi-family and commercial lots. Yaklich started the platting process with Grand County in the mid-1990's but did not receive final plat approval until April 2000. In 1996, Yaklich formed Tabernash Meadows Water and Sanitation District (the District) as part of the development process. He was chairman of the District's Board of Directors from its inception through November of 2002, when he resigned.

On August 9, 2000, Yaklich negotiated a loan to Tabernash from Peak National Bank (Peak) in the amount of $3,500,000 to develop Pole Creek Valley. The loan was secured by a First Deed of Trust conveying Lots 1-15, 22-113 and MF1-2, and Yaklich's personal guaranty. The construction of the District's water and sanitation facilities was funded by general obligation bonds issued in the amount of $5,300,000. Yaklich negotiated the issuance of the bonds, representing both the District and Tabernash, and signed the bonds' offering statements on behalf of the District. The bonds were secured, in part, by the District's covenant to levy ad valorem property taxes on the lots and to collect "tap fees" from new users. The bonds were also secured by Tabernash's Developer Guaranty Agreement (Guaranty) wherein it agreed to pay the principal and interest on the

bonds, up to a maximum of $4,758,000, in four "Minimum Annual Guaranty" payments to start in 2000 and continue through 2003. As security for its payment obligations, Tabernash granted the District a lien against certain Pole Creek Valley properties, some of the properties junior to Peak's Deed of Trust.[1] The Guaranty provided for the release of portions of the District's liens upon Tabernash's compliance with its payment terms. In case of default, the District was given several remedies, including initiation of foreclosure proceedings.

Tabernash started selling single-family lots in mid-2000. Delays in the completion of the water system, allegedly due to Grand County's erroneous cost projections, caused Tabernash to request building permits be issued even though the water system had not been completed. In reliance on Yaklich's representation that the completion of the water system was imminent, Grand County allowed building permits to be issued. When the water system was not completed as promised, Grand County required the District to post security for completion of the water system.

Delay of the water system was not the only problem. Sales of Pole Creek Valley lots were far below Tabernash's initial projections. By the time the first "Minimum Annual Guaranty" payment came due in November 2000, only thirty-

_____

[1] Specifically, Tabernash guaranteed the following amounts based on a tap fee price of $13,000 per tap: $1,196,000 in 2000 or fees from ninety-two taps; same in 2001; $1,183,000 in 2002, or fees from ninety-one taps; same in 2003. Over time, the tap fee increased to $15,000 and then to $20,000.

one single-family lots had been sold, creating a shortfall of $793,000. Six more lots were sold in early 2001, leaving a shortfall of $715,000. Tabernash took out a $900,000 loan from First United Bank to make up the difference. To provide unencumbered collateral for the loan, Yaklich, acting as president of the District, caused the District to release its lien on four lots not encumbered by the Peak Deed of Trust. Tabernash pledged these and other lots as collateral to First United Bank.

Tabernash payed $715,000 of the loan proceeds to the District in March 2001, but disputes arose over which properties would be credited with the tap fees. Sales continued to decline over the next two years. The cause for the failure of the project became a matter of contention between Tabernash, the District and the County. Tabernash did not make any further Guaranty payments to the District and Yaklich eventually resigned from the District's Board of Directors.

After Yaklich's resignation, the District commenced judicial foreclosure proceedings on its junior Deed of Trust with the Grand County Public Trustee's Office. The Grand County district court subsequently entered orders authorizing a foreclosure sale. On June 6, 2003, Tabernash filed a separate action in Grand County district court, seeking a preliminary injunction to enjoin the foreclosure. The preliminary injunction was denied. On July 24, 2003, Tabernash filed a Chapter 11 bankruptcy petition, staying the District's foreclosure action.

Peak subsequently filed a complaint against Yaklich in Denver district court alleging breach of his personal loan guarantees. In February 2004, the Denver district court entered two judgments against Yaklich in Peak's favor, one for $1,461,511.93, and the other for $406,411.41. Meanwhile, after holding a two-day hearing on the District's Motion for Release from Stay, on April 14, 2004, the bankruptcy court granted the motion, concluding Tabernash had not shown it was able to present an adequate reorganization plan. In July 2004, Peak assigned its judgments against Yaklich and its interest in the first deed of trust to Colorado BondShares.

On June 13, 2005, Yaklich filed suit in the United States District Court for the District of Colorado against four groups of defendants: (1) the "County" defendants, including the Grand County Board of County Commissioners, County Manager Luraine Underbrink Curran, and Grand County Director of Planning and Zoning William Gray; (2) "the Bank of the West" defendants, including its President Teresa Turner; (3) the "BondShares" defendants, including its President Fred Kelley; and (4) the "District" defendants, including its Manager Lurane Kourse, its Bookkeeper Elizabeth Redfield, its Board of Directors, the Board's President Irene Cook, and individual directors Bob Alexander, Gretchen Bretz, Doug Ouri and Mr. Stovall.

Each group of defendants filed motions to dismiss under either Rule 12(b)(1) for lack of subject matter jurisdiction or Rule 12(b)(6) for failure to state

a claim upon which relief can be granted.  *See* Fed. R. Civ. P. 12(b)(1), (b)(6).  The district court granted the motions to dismiss.

## II.  STANDARD OF REVIEW

We review de novo a dismissal for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), and review findings of jurisdictional facts, if any, for clear error.  *Davis ex rel. Davis v. United States*, 343 F.3d 1282, 1294-95 (10th Cir. 2003).  Whether a claim is ripe for review "bears on the court's subject matter jurisdiction under the case or controversy clause of Article III of the United States Constitution."  *New Mexicans for Bill Richardson v. Gonzales,* 64 F.3d 1495, 1498-99 (10th Cir. 1995).  Accordingly, a ripeness challenge, "like [most] other challenges to a court's subject matter jurisdiction, is treated as a motion to dismiss under Rule 12(b)(1)."  *Id.* at 1499.

We review de novo the legal sufficiency of a complaint under Rule 12(b)(6).  *Sutton v. Utah State Sch. for the Deaf & Blind,* 173 F.3d 1226, 1236 (10th Cir. 1999).  Such a motion "admits all well-pleaded facts in the complaint as distinguished from conclusory allegations."  *Mitchell v. King,* 537 F.2d 385, 386 (10th Cir. 1976).  In reviewing a motion to dismiss, the court must "look for plausibility in the complaint."  *Alvado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) (quotation and citation omitted).  Under this standard, a complaint must include "enough facts to state a claim to relief that is plausible on its face."  *See Bell Atlantic Corp. v. Twombly*, --U.S.--, 127 S.Ct. 1955, 1974

(2007).

## III. DISCUSSION

A.  <u>Federal Claims</u>[2]

1.  *Conspiracy to Deprive Civil Rights (Claims 2 and 3)*

Yaklich's Complaint alleged the County and District defendants

discriminated against him in violation of 42 U.S.C. § 1985(3)[3] based on his

gender and failed to prevent such discrimination in violation of 42 U.S.C.

§ 1986.[4]

---

[2]  Yaklich's opening brief fails to address the dismissal of his claim alleging conspiracy in violation of 42 U.S.C. § 1983.  Therefore, the claim is waived.  *See State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 984 n.7 (10th Cir. 1994).

[3]  Section 1985(3) provides in relevant part:

If two or more persons . . . conspire . . . for the purpose of depriving . . . any person . . . of the equal protection of the laws, or of equal privileges and immunities under the laws; . . . or cause to be done, any act in furtherance of the object of such conspiracy, . . . the party so injured or deprived may have an action for the recovery of damages . . . .

[4]  Section 1986 provides in pertinent part:

Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, . . . for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented.

"The essential elements of a § 1985(3) claim are: (1) a conspiracy; (2) to deprive plaintiff of equal protection or equal privileges and immunities; (3) an act in furtherance of the conspiracy; and (4) an injury or deprivation resulting therefrom." *Tilton v. Richardson*, 6 F.3d 683, 686 (10th Cir. 1993). "The language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971) (footnote omitted). In other words, "[i]n order to support a section 1985(3) claim, the plaintiff must be a member of a statutorily protected class, and the actions taken by defendant must stem from plaintiff's membership in the [protected] class." *Silkwood v. Kerr-McGee Corp.*, 637 F.2d 743, 746 (10th Cir. 1980).

Outside the context of racial discrimination, the Supreme Court has not defined what "otherwise class-based" discrimination may be protected under § 1985(3). The parties dispute whether a claim based upon gender bias is one of the protected classes. Because Yaklich's claim fails for a separate reason, we need not determine the scope of the statute here. *See United Bhd. of Carpenters & Joiners of Am. v. Scott*, 463 U.S. 825, 836 (1983).

Even if gender is a protected class, Yaklich's complaint contains no factual allegation of racial or class-based motivation. *See Hughes v. Ranger Fuel Corp.*, 467 F.2d 6 (4th Cir. 1972); *Action v. Gannon*, 450 F.2d 1227 (8th Cir. 1971); and

*Kletschka v. Driver*, 411 F.2d 436 (2nd Cir. 1969). He merely alleges the same gender-neutral actions taken against him to ensure his bankruptcy were based on his gender. This conclusory statement is insufficient to state a claim. *See Tal v. Hogan*, 453 F.3d 1244, 1261 (10th Cir. 2006) ("Conclusory allegations . . . without any supporting facts are insufficient . . . ."), *cert. denied*, 127 S.Ct. 1334 (2007). Section 1985(3) was not intended "to reach conspiracies motivated by bias towards others on account of their economic views, status, or activities." *United Bhd. of Carpenters & Joiners of Am.*, 463 U.S. at 837 (emphasis omitted).

Because the § 1985(3) claim is insufficient, Yaklich's § 1986 claim also fails. *Taylor v. Nichols*, 558 F.2d 561, 568 (10th Cir. 1977) ("A claim under Section 1986 exists for refusal to take positive action where the circumstances demand to prevent acts which give rise to a cause of action under Section 1985. In view then of this relationship, there cannot be a valid claim under Section 1986 unless there is also a claim under Section 1985."). The district court properly dismissed these claims.

2. *Regulatory Taking and Procedural Due Process (Claims 6 and 7)*

Yaklich alleged the County and the District violated his Fifth and Fourteenth Amendment rights by regulating the Pole Creek Valley property to the point it became worthless – an inverse condemnation – without providing him just compensation. He further alleged these defendants violated his Fourteenth Amendment procedural due process rights premised on the alleged taking. The

-10-

district court dismissed these claims with prejudice because Yaklich failed to exhaust the eminent domain remedies provided for in Colo. Rev. Stat. Ann. §§ 38-1-101 to 122.

The Just Compensation Clause of the Fifth Amendment states: "[P]rivate property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. This prohibition applies against the states through the Fourteenth Amendment. *See Chicago, B. & Q.R. Co. v. Chicago*, 166 U.S. 226, 241 (1897). "The Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation." *Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 194 (1985). "Nor does the Fifth Amendment require that just compensation be paid in advance of, or contemporaneous with the taking; all that is required is that a reasonable, certain and adequate provision for obtaining compensation exist at the time of the taking." *Id.* (quotation omitted). "[I]f a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation." *Id.* at 194-95. "[T]he ripeness requirement of *Williamson* applies to due process and equal protection claims that rest upon the same facts as a concomitant takings claim." *Bateman v. City of West Bountiful*, 89 F.3d 704, 709 (10th Cir. 1996).

Yaklich does not address the *Williamson* exhaustion of state remedies

requirement. Rather, he asserts his claims are final under *Abbot Laboratories v. Gardner*, because the defendants' decisions were definite, had the status of law, and compliance with the law had a direct and immediate effect on his day-to-day business. 387 U.S. 136, 151-52 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977). Even if the decisions of the County and District were final, Yaklich cannot bring a takings claim until he utilizes the Colorado compensation procedure.

At all times relevant to this lawsuit, Colorado has statutorily provided a method for seeking just compensation under eminent domain proceedings. *See* Colo. Rev. Stat. Ann. §§ 38-1-101 to 122; *see also Linnebur v. Pub. Serv. Co. of Colo.*, 716 P.2d 1120, 1123 (Colo. 1986) ("An inverse condemnation action . . . is to be tried as if it were an eminent domain proceeding."). Section (2)(a) of § 38-1-101 provides:

> In all cases in which compensation is not made by the state in its corporate capacity, such compensation shall be ascertained by a board of commissioners of not less than three disinterested and impartial freeholders pursuant to section 38-1-105(1) or by a jury when required by the owner of the property as prescribed in section 38-1-106. All questions and issues, except the amount of compensation, shall be determined by the court unless all parties interested in the action stipulate and agree that the compensation may be so ascertained by the court. In the event of such stipulation and agreement, the court shall proceed as provided in this article for the trial of such causes by a board of commissioners or jury.

Yaklich claims he is not required to comply with the statute because his efforts would be futile. The district court disagreed, stating the statute does not require

-12-

approval of the various defendants to determine the taking or just compensation. We agree.

Yaklich's regulatory takings and due process claims fail because he did not exhaust available Colorado remedies. As a consequence, Yaklich's claims are not ripe and the district court could not address their merits. Dismissal with prejudice, however, was inappropriate. *See Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1216 (10th Cir. 2006) ("[W]here the district court dismisses an action for lack of jurisdiction . . . the dismissal must be without prejudice."); *cf. Hollander v. Sandoz Pharm. Corp.*, 289 F.3d 1193, 1216-17 (10th Cir. 2002) (dismissal for lack of personal jurisdiction should be without prejudice when it does not address merits of claim). We reverse the district court's dismissal of claims 6 and 7 with prejudice and remand for dismissal without prejudice.

B. State Law Claims

1. *Colorado Government Immunities Act (Claims 1, 4, 5, 8, and 9)*

Yaklich alleged state law claims of civil conspiracy, intentional and tortious interference with contractual relations, intentional infliction of emotional distress (outrageous conduct) and civil conversion against the County and District defendants. The district court dismissed these claims for lack of jurisdiction because Yaklich failed to provide these defendants notice within 180 days of discovering his injury, as required by the Colorado Government Immunities Act (CGIA).

Under the CGIA, anyone claiming to have suffered an injury by a public entity or its employee must file written notice within 180 days after the discovery of the injury, regardless of whether the person knew all of the elements of the claim or of a cause of action for such injury. *See* Colo. Rev. Stat. Ann. § 24-10-109(1). Compliance with the 180-day notice requirement is a jurisdictional prerequisite and failure to comply with it is an absolute bar to suit. *Id.*; *see also Gallagher v. Bd. of Tr. for Univ. of N. Colo.*, 54 P.3d 386, 393 (Colo. 2002) (en banc). "[N]on-claim statutes and the issue of subject matter jurisdiction are not subject to equitable defenses such as waiver, tolling, or estoppel." *Gallagher*, 54 P.3d at 393. Furthermore, "the judicially-constructed continuing violation doctrine cannot be used to remedy an untimely filing under the CGIA." *Id.*

"For purposes of the CGIA, . . . the notice period is triggered when a claimant has *only discovered* that he or she has been wrongfully injured." *Id.* at 391.

> [T]he plaintiff need not yet know the cause of the injury nor must all elements of the claim have ripened before the plaintiff must file [his] notice of claim. The plaintiff's 180-day time limit may expire if [he] wait[s] to discover the cause of [his] injury before filing pursuant to the CGIA. . . . [T]he trial court is the pre-trial fact-finder to determine whether notice was timely filed-that is, when the injury was discovered by the claimant. When there is a factual dispute concerning when the plaintiff discovered [his] injury, an evidentiary hearing is necessary to resolve the dispute. The trial court may also permit limited discovery to decide the notice issue. The plaintiff has the burden of proving jurisdiction and the trial court will not construe inferences in favor of the plaintiff.

*Id.* (citation omitted).  Relying on the order granting the District relief from stay in Yaklich's bankruptcy proceedings, the district court determined Yaklich was aware of his injuries well before September 3, 2004, 180 days before he gave notice on March 2, 2005.

Yaklich argues the conspiracy is the "real harm," and the conspiracy of all the defendants did not "occur" until the fall of 2004; it "could not have occurred in Plaintiff's mind sooner."  (Appellant's Br. at 28.)  Yaklich further maintains the question of whether he had "knowledge" or "discovered" his injuries prior to September 3, 2004, is a factual question which could not be resolved without an evidentiary hearing.

The question is when Yaklich "knew or, through the exercise of reasonable diligence, should have known" of his injury.  *Trinity Broadcasting of Denver, Inc. v. City of Westminster*, 848 P.2d 916, 923 (Colo. 1993) (en banc).  A review of the bankruptcy court order leaves no question that Yaklich should have been aware of his injuries well before September 3, 2004.[5]  The bankruptcy court

[5]  The bankruptcy court's order was not included in Yaklich's complaint, but he made reference to the Bankruptcy action and its effect upon him. "Generally, a district court must convert a motion to dismiss into a motion for summary judgment when matters outside the pleadings are relied upon."  *Utah Gospel Mission v. Salt Lake City Corp.*, 425 F.3d 1249, 1253 (10th Cir. 2005) (emphasis omitted).  "We have recognized however, that a document central to the plaintiff's claim and referred to in the complaint may be considered in resolving a motion to dismiss, at least where the document's authenticity is not in dispute."  *Id*. at 1253-54 (citing *County of Santa Fe v. Pub. Serv. Co. of N.M.*, 311 F.3d 1031, 1045 (10th Cir. 2002)).  Yaklich did not contest the bankruptcy court's order as an invalid document and it was reasonable for the district court to review

determined Tabernash had not shown it was capable of effectuating a successful reorganization, that the value of the land at Pole Creek was insufficient to service the debt, and Yaklich was unable to demonstrate that financing was "imminent or even possible." (Bankruptcy Order at 16.) These findings were allegedly based, in part, on deliberate testimonial misrepresentations at the bankruptcy hearing given by several County and District defendants. In the bankruptcy order, the court noted the District had formally opposed Yaklich's proposed plan to save Tabernash as well as Yaklich's other unpaid personal debts which would impede a successful extrication from financial disaster. Taking Yaklich's current allegations as true, he clearly should have known that County and District actions had caused him injury when he received the bankruptcy court's ruling.

Yaklich attempts to avoid the statutory time limitations by alleging the defendants entered "into a series of conspiracies designed to deny Robert Yaklich of his property rights." This is not sufficient. Knowledge of *injury* is all that is necessary. Knowledge of the cause of action or the identity of the tortfeasor is not required. *See East Lakewood Sanitation Dist. v. District Court,* 842 P.2d 233, 235-36 (Colo.1992) (knowledge of the identity of the tortfeasor not required for running of notice period). Further, a "series of conspiracies" is akin to a continuing violation, on which he cannot rely. *Gallagher*, 54 P.3d at 393.

_____

the order to determine when Yaklich became aware of his injuries for CGIA purposes.

-16-

Because the bankruptcy court's order was not contested as invalid, the district court was not required to hold an evidentiary hearing or provide for limited discovery regarding the date Yaklich knew of his injury. *See Padilla ex rel. Padilla v. Sch. Dist. No. 1 in the City and County of Denver*, 25 P.3d 1176, 1180 (Colo. 2001) (en banc) ("Where there is no evidentiary dispute, governmental immunity or waiver of immunity is a matter of law, and the trial court may rule on the jurisdictional issue without a hearing."). The district court properly dismissed Claims 1, 4, 5, 8 and 9 against the County and District defendants under the CGIA.

2. *Breach of Contract (Claim 10)*

The CGIA applies only to tort claims and therefore does not bar Yaklich's breach of contract claim against the District and its Board of Directors. The district court declined to exercise supplemental jurisdiction over the claim and dismissed it without prejudice. Yaklich's only argument in his opening brief on this issue is as follows: "Appellant has demonstrated that it was also error to dismiss the Tenth Claim without prejudice." (Appellant's Br. at 37.) This conclusory statement will not preserve this issue. *See Am. Airlines v. Christensen,* 967 F.2d 410, 415 n.8 (10th Cir.1992) ("It is insufficient merely to state in one's brief that one is appealing an adverse ruling below without advancing reasoned argument as to the grounds for the appeal." (citing Fed. R. App. P. 28(a)(4)). Because the district court had dismissed the federal claims

-17-

with prejudice, the court did not abuse its discretion in dismissing Claim 10. *See* 28 U.S.C. § 1367(c)(3) ("The district court may decline to exercise supplemental jurisdiction over a claim . . . if . . . [it] has dismissed all claims over which it has original jurisdiction.").

   3. *Civil Conspiracy and Outrageous Conduct (Claims 1 and 8)*

Yaklich complains the district court erroneously dismissed his civil conspiracy and outrageous conduct claims against the private entities, Bank of the West and BondShares. While Yaklich abandoned his claims against Bank of the West at oral argument, he continues to claim the district court erred in dismissing these claims against the BondShares defendants under the *Rooker-Feldman* doctrine. *See D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923).

      a.  Rooker-Feldman Doctrine

The *Rooker-Feldman* doctrine is a narrow one confined to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 284 (2005). The doctrine does not apply to parallel state and federal litigation and "does not otherwise override or supplant preclusion doctrine or augment the circumscribed doctrines that allow federal courts to stay or dismiss proceedings in deference to state-court actions." *Id.* at

284, 292. More specifically, it does not deprive lower federal courts of jurisdiction if the federal court suit was filed before the end of the state court's appeal process. *See Guttman v. Khalsa*, 446 F.3d 1027, 1031-32 (10th Cir. 2006).

It must be remembered that BondShares did not even come into the picture until after Yaklich defaulted, Peak secured the judgments against Yaklich, and the bankruptcy court ordered the stay of foreclosure on the Pole Creek properties removed. Yaklich alleges, after BondShares received payment in full on its loans in March 2005, it took title to Lot 48 and proceeded to unlawfully foreclose on the same property in May 2005. In addition, some time in late 2004 and early 2005, BondShares failed to credit the District's foreclosure sales to Yaklich's debt. It was only when Yaklich filed suit in the Colorado district court that BondShares properly credited his account.[6] Based on these allegations, Yaklich alleged in Claim 1 that BondShares conspired with the other defendants to bankrupt him. In Claim 8, Yaklich alleged BondShares engaged in extreme and outrageous conduct with the intent of causing him severe emotional distress.

At the time Yaklich filed his complaint in this case, the state court had not reached a final judgment determining whether BondShares properly credited

---

[6] The record reveals Yaklich did not file a separate suit against BondShares, but rather filed a motion to apply the foreclosure proceeds to the judgments against him in the ongoing case originally brought by Peak against Yaklich. The Denver district court granted Yaklich's motion in part by requiring BondShares to provide a verified accounting of all sales of the collateral securing the debts underlying the judgments.

Yaklich with the foreclosure sale's proceeds. BondShares' motion to dismiss admitted this fact. Therefore, the district court improperly dismissed this claim under *Rooker-Feldman*. *Id.*, 446 F.3d at 1032 (holding that federal district court had subject matter jurisdiction to hear case, notwithstanding *Rooker-Feldman* doctrine, where plaintiff filed federal suit while certiorari petition to New Mexico Supreme Court was pending in similar state court action).

Alternatively, BondShares argues Yaklich failed to plead sufficient facts to establish the claims against it. However, BondShares did not raise this alternative argument below. Ordinarily, "a federal appellate court does not consider an issue not passed on below." *Singleton v. Wulff*, 428 U.S. 106, 120 (1976). While this general rule is not absolute, we decline to exercise our discretion, in this instance, because we do not know the exact nature of the state court claims or whether the state court has reached an ultimate resolution. We remand these state law claims to the district court for dismissal without prejudice. 28 U.S.C. § 1367(c)(3).

**AFFIRMED** in part, **REVERSED** in part, and **REMANDED** for action consistent with this Order and Judgment.

ENTERED FOR THE COURT

Terrence L. O'Brien
Circuit Judge